263 So.2d 664

**TRUSTEES OF HOWARD COLLEGE, a Corporation (Now Samford University, a Corporation), et al.**

**v.**

**J. G. McNABB et al.**

**6 Div. 898.**

Supreme Court of Alabama.

June 8, 1972.

Rehearing Denied June 29, 1972.

Lange, Simpson, Robinson & Somerville and Reid B. Barnes and C. John Holditch, Birmingham, for appellants.

Barber, Johnston & Holmes, Birmingham, for appellees.

**BLOODWORTH, Justice.**

This declaratory judgment action was filed by appellees in the circuit court of Jefferson County, in equity, seeking to establish the respective rights of the parties in an 85 acre tract of real estate known as the Edgewood Lake property.

This land is generally located in or near the City of Homewood, Alabama, between North Lakeshore Drive and South Lakeshore Drive (on the north and south), and between property owned by Samford University (on the east), and Green Springs Highway (on the west). From the 1920's to the 1940's, the property was the site of Edgewood Lake, which has since ceased to exist.

Appellees-complainants, J. G. McNabb and others, are owners of homes adjoining the subject property. Appellants-respondents are the Trustees of Howard College (now Samford University) which presently owns the property. Also, joined as respondents in the bill were J. D. Pittman and Edgewood Development Company. (We may hereinafter refer to "Howard College" as "Samford University," or as "the college").

The contention between the parties is as to the effect of certain terms, conditions, or restrictions which were incorporated by reference in the quitclaim deed from Investors Syndicate to Howard College conveying the subject property in 1947. (At times the parties refer to the restrictions as "covenants" and so shall we.)

The trial court entered a final decree which placed upon Samford University the obligation to perform one of the two affirmative covenants (paragraph 1 hereinbelow) and to refrain from violating certain portions of the negative covenant (paragraph 2 hereinbelow). The other affirmative covenant (paragraph 3) was held invalid. The Trustees of Samford University appeal from this decree, except for that portion which held paragraph 3 to be invalid.

We are of the opinion that the trial court erred in decreeing that the two covenants are binding on Samford University, and therefore conclude that the trial court's decree must be reversed in this respect.

Sometime in the early 1920's (the exact date being unclear from the record), the old Birmingham Motor and Country Club built a dam across Shades Creek creating Edgewood Lake, sometimes referred to as Shades Lake. In 1926, a corporation known as Lake Shore Estates Company purchased approximately 500 acres on the periphery of, and, Edgewood Lake. From 1926 to 1930, Lake Shore Estates Company built and sold houses in a subdivision located north of the lake, known as Lake Shore Estates. The testimony indicated that there was a problem with flooding during this period, but that there was never a

break in the dam and the lake remained intact.

During the early 1930's, Lake Shore Estates Company began to encounter financial difficulties. A substantial portion of the Edgewood Lake property had been mortgaged to Kamram Development Company. In 1932, this mortgage was foreclosed. At the foreclosure sale, the property was purchased by Investors Syndicate, Inc. Subsequently, certain additional lots, not included in this mortgage, were purchased by Investors Syndicate.

On November 15, 1940, Investors Syndicate conveyed Edgewood Lake, then comprising some 127 acres, to Jefferson County by a quitclaim deed. After the granting clause, the deed contained the following language:

"It is understood and agreed by and between the parties hereto, that said property is conveyed subject to the following terms, conditions, restrictions and limitations:—

"1. That said property shall be used as a parkway only. The grantee agrees to beautify and use the property hereby conveyed as such a parkway and the grantee shall have full charge and control of said property for such purpose, use and beautification.

"2. It is agreed that said property shall not be used as a public park or amusement place; that no boats shall be permitted on said lake or property; that there shall be no swimming, hunting or fishing on or in said lake or property; that no amusements or entertainments of any kind shall be permitted or maintained on said property; that no structures or buildings shall be placed or maintained on said property without the written consent of the Investors Syndicate; that said property or said lake shall not be used as a picnic grounds; that no one shall be permitted to camp or reside on said lake or property or engage in any business or undertaking thereon, and that there shall be no parking of automobiles or other vehicles thereon. The grantee agrees not to permit said lake or

property to be used in violation of the terms set forth in this paragraph. The terms, conditions, restrictions and limitations set forth in this paragraph shall constitute and be covenants running with the said property hereby conveyed.

"3. It is the desire of the undersigned that said lake and dam be maintained and the undersigned Jefferson County does hereby agree to maintain said lake, dam and property herein conveyed.

"4. It is further agreed by and between the parties hereto that the Investors Syndicate and the owners of property abutting said lake shall have the right to enforce the terms, conditions, restrictions and limitations herein set forth.

"5. It is further agreed that if the said terms, conditions, restrictions and limitations herein set forth are violated, the Investors Syndicate shall, at its option, have the right to declare this conveyance null and void, and thereupon this conveyance shall become null and void, and the title to the property herein conveyed shall revert to and immediately vest in the Investors Syndicate, and the rights hereunder of Jefferson County, said owners of abutting property, and all other persons shall be immediately terminated and become null and void, except that the terms, conditions, limitations and restrictions set forth in paragraph two shall be and remain in full force and effect.

"6. By joining in the execution of this instrument, Jefferson County does hereby agree to the terms, conditions, limitations and restrictions set forth above. It is also agreed by and between the parties hereto that no action or claim shall be maintained by Investors Syndicate against Jefferson County for the breech by it of any of the terms, conditions and agreements herein set forth, or for the failure to maintain the said dam or enforce the terms, conditions and restrictions herein set forth, except that in the event the property hereby conveyed reverts to the Investors Syndicate and it becomes necessary for the Investors Syndicate to file suit to remove any cloud

upon its title to the property hereby conveyed, it shall have the right to institute such a proceeding. It is also the intention of the parties hereto that no other person, firm or corporation shall have the right to maintain any claim or action against either of the parties hereto for the violation of any of the terms, conditions or agreements herein set forth, provided that nothing in this paragraph contained shall be deemed to limit or restrict the maintenance of any action or claim for the enforcement of, or for a breach, of any of the terms, conditions, restrictions, limitations and agreements in this agreement set forth against any other person, firm or corporation. It is agreed that Jefferson County shall have the right to convey the property herein described to the Highway Department of the State of Alabama."

Subsequent to this conveyance, the dam broke and the lake drained. Some of the testimony indicates that the dam was repaired the first time it broke, but later gave way again. In any event, the lake ceased to exist in the mid-1940's. Mr. H. A. Snow, Jefferson County Engineer, testified that the lake's demise was largely due to the radical changes in the physical makeup of the watershed brought on by urban development. According to Mr. Snow, the extensive building and paving on Shades Mountain, and the surrounding areas, prevented the run off water from soaking into the ground, as it did when the area was covered with natural vegetation. This caused the lake to dry up in dry weather and to flood so extensively during heavy rains that the dam could not contain the excess water.

On June 12, 1947, Investors Syndicate conveyed by quitclaim deed all of its right, title, interest, and claim in the realty to the Trustees of Howard College, its successors and assigns, for a consideration of five dollars. This deed contained the following provisions, viz:

"It is understood and agreed that the above described property is quit claimed unto the grantee herein *subject to all the terms, conditions, restrictions and provisions set forth in that certain deed executed by the grantor herein to Jefferson County,* Alabama, under date of November 15th 1940 * * *." [Our emphasis]

According to Mr. Frank Bainbridge, the attorney for Investors Syndicate, "The failure [on the part of the county] to maintain the lake and to beautify the property injured the Syndicate property, abutting property, south of the lake and that is the reason they deeded it to the Trustees of the College, whatever rights they had in it."

On the 29th of July, 1947, Jefferson County also quitclaimed its interest in the property to the Trustees for a consideration of one dollar. After describing the property, the deed provided, viz: "[S]ubject to all easements, restrictions and rights of way now imposed upon said land or the use thereof."

At the time Howard College acquired the property, the dam was almost completely washed away and the lake bed had become a swampy and marshy area. The testimony indicates there was an area of about twenty acres of water next to the dam which had not drained out. Throughout the old lake bed there were numerous pools of stagnant water varying from a few inches to a few feet in depth. Shades Creek drained into, and out of, the lake area, but followed no defined channel or course through the marsh.

In 1955 or 1956, Mr. J. D. Pittman, one of three partners doing business as Edgewood Development Company, made an oral agreement with Howard College to clean up the lake area. There was no formal contract, but Mr. Pittman testified that he agreed to do the work for the college without charge, since he considered that he could sell enough topsoil from the lake bed to cover his cost. Mr. Pittman bulldozed and hauled away what was left of the old dam, bulldozed the undergrowth, and leveled off the lake bed. He also dug several

ditches to complete drainage of the area.[1] When the lake bed had dried out, Mr. Pittman proceeded to sell the silt which had accumulated on the bottom of the lake for topsoil. The record does not indicate the total amount of topsoil removed, but approximately 60,000 yards of topsoil were used on the Howard College campus. Mr. Pittman brought in an old Greyhound bus body, with the wheels removed, and parked it on the lake property. He used the bus body to house his machinery and supplies. A sign on top of the bus body advertized the sale of topsoil.

On June 4, 1957, appellees, owners of homes adjoining the lake property, filed this suit to have the covenants in the deed from Investors Syndicate to Jefferson County declared to be binding on Howard College. The case did not come to trial until November 12, 1969, and final decree was not rendered until May 12, 1971.[2] The cause was submitted on oral argument in this court April 14, 1972.

The final decree held, inter alia: that it was impractical to restore the dam and lake and that the college was not required to do so; that the college cannot convey the lake property to any private party; that the college shall not permit the parking of vehicles on the property, nor permit anyone to reside on, nor engage in business on, the property; that the college shall refrain from cutting and selling timber from the property; that the college shall not engage in the digging or removal of topsoil from the property; that the college shall not use the property, nor permit the property to be used, for any purpose other than a parkway; and that the college is obligated and required to beautify the property for use as a parkway.

In effect, the trial court upheld the first affirmative covenant (paragraph 1), and a part of the negative covenant (paragraph 2). The court held that compliance with the second affirmative covenant (paragraph 3) requiring maintenance of the lake and dam, was impractical.[3]

Appellants-respondents (the Trustees) appealed from this decree, insisting that the trial court erred in holding that the two covenants were binding. (Neither party contends the trial court erred in its ruling with respect to the 3rd covenant.)

First, the appellants insist that the trial court erred in holding that the college is bound by the affirmative covenant in paragraph 1 of the deed to Jefferson County requiring the grantee to beautify the property. Appellants insist that, under the express provisions of paragraph 5 of the same deed, title to the property reverted to, and vested in, Investors Syndicate when Jefferson County violated the affirmative covenant in paragraph 3 by failing to maintain the lake and dam; that, under the further provisions of paragraph 5, such reverter had the effect of cancelling all of the restrictions and covenants, with the express exception of the negative covenant in paragraph 2.

Appellants further insist that Jefferson County recognized that it had breached the covenant to maintain the lake and dam and, in effect, acquiesced in the reverter by subsequently quitclaiming all of its interest in the property, if any, to Howard College.

█ Since the common law doctrine of livery of seizen has been abolished in Alabama (Title 47, § 33, Code of Alabama),

1. Later, when Green Springs Highway was constructed, the county obtained a channel easement and constructed two channels, on the northern and southern extremity of the lake bed, to control the flow of Shades Creek and to complete drainage of the area. Condemnation of the right of way for Green Springs Highway reduced the lake property from 127 acres to approximately 85 acres, its present size.

2. Appellants state, in brief, "the case did not come to trial until November 12, 1969, for reasons that the parties may attempt to explain if the Court so desires * * *." No such request was made by this court.

3. Testimony indicated that reconstruction of the lake and dam would result in the flooding of a substantial portion of Green Springs Highway.

actual re-entry is not required to effect reverter.

The Arkansas Supreme Court, after declaring the common law doctrine of livery of seizen had been abolished in that State by statute, proceeded to hold that a "subsequent deed, executed by an original grantor on condition, is equivalent to re-entry, and is effectual for the purpose of declaring a forfeiture, and vesting the title in the subsequent grantee. * * *" Moore v. Sharpe, 91 Ark. 407, 121 S.W. 341, 345 (1909).

In Sherill v. Sherill, 211 Ala. 105, 99 So. 838 (1924), the grantor conveyed land to the respondents on condition that they care for her during her lifetime. Respondents subsequently abandoned their obligation. The grantor later conveyed to complainants. This court held that conveyance to the complainants, following the breach of the condition, coupled with grantor's collection of rents, was sufficient to divest respondents of their title.

We conclude that, following Jefferson County's breach of the covenant to maintain the lake, title reverted to Investors Syndicate, Inc., and the Syndicate, by its conveyance to Howard College, manifested its intent to terminate the County's interest, and effected a reversion in title.

Appellees do not argue that the deed from Investors Syndicate to Howard College was not effective to constitute a reverter, but they insist that no reverter took place because the property had been irrevocably dedicated as a "parkway" prior to the conveyance to Howard College. Appellees apparently argue that there has been both a common law and statutory dedication of this property.

We will first consider appellees' contentions as to a common law dedication. Appellees contend that "the lake site was dedicated as a parkway by the original subdivision planners who were the predecessors in title to Investors Syndicate"; that the proximity of Edgewood Lake was one of the main selling points relied on in promoting the sale of the lots in Lake Shore Estates; that Lake Shore Estates Company published a brochure stressing the fact that homeowners in Lake Shore Estates would have full use of the lake property; that Investors Syndicate "ratified the acts of its predecessors in title when it took an active part, released mortgages on the lots as they were sold and selling off the balance after getting title themselves, some of them being sold after dedicating the lake and property as a parkway." The principal authority they cite for these contentions seems to be Allen v. Axford, 285 Ala. 251, 231 So.2d 122 (1970).

We have concluded that none of these contentions is sufficient to sustain a finding that there has been a common law dedication of this property. The rule of our cases has long been followed that,

"* * * To constitute a dedication [at common law] there must of course be an *intention* of the owner to dedicate the property and an *acceptance* by the public or by some authorized person or body of persons acting in its behalf. * * *" [Our emphasis] Smith v. City of Dothan, 211 Ala. 338, 340, 100 So. 501, 502 (1924).

"To establish a dedication, *the clearest intention* on the part of the owner to that effect must be shown, and the evidence must be *clear and cogent,* and the *acts* of the owner relied on to establish a dedication must be *unequivocal* in their indication of the owner's intention to create a public right exclusive of his own. * * *" [Our emphasis] O'Rorke v. City of Homewood, 286 Ala. 99, 104, 237 So.2d 487, 491 (1970).

We do not consider that the inclusion of pictures of the lake in the brochure, the use of the proximity of the lake to promote sales of adjacent real estate, even the brochure's promise to prospective purchasers of full use of the lake, can be said to constitute "a clear and cogent" intention on the part of the grantor "to create *a public right* exclusive of his [its] own." [Our emphasis]

We would also point out that the case of Allen v. Axford, supra, is inapposite. That case held that covenants, forbidding anything but "detached residences" on certain subdivision lots, ran with the land and created "equitable easements in favor of the owners of the several lots." In effect, the case held that the covenants in question were enforceable as private easements. The case was not concerned with a common law dedication to the public.

■ Appellees have also argued for a statutory dedication of the property as a lake, by alleging that "Investors Syndicate had platted and mapped this area into a subdivision and designated thereon a parkway area containing a lake, and had sold these lots to purchasers who relied on the map and plat when they purchased." However, none of the maps introduced in evidence shows any specific area designated as a "parkway." There is a map, to which we assume appellees refer, which shows the lake with an area adjoining the lake subdivided into numbered lots. In the center of the space representing the lake are the words "Edgewood Lake," but nowhere on the map is there any designation of a specific area as a "park" or "parkway." We cannot agree with appellees that the identification of a body of water on the map as a "lake" is a sufficient compliance with our statutes so as to make of such designation on such map a statutory dedication *to the public.*

In Stringer Realty Co. v. City of Gadsden, 256 Ala. 77, 53 So.2d 617 (1951), this court specifically held that in order for a map or plat to operate as a statutory dedication the lands in question must be designated as "public grounds."

Moreover, there is an even more compelling reason why this property cannot have been the subject of a common law or statutory dedication. The rights which appellees claim to have been granted by the original subdivision developers, or by Investors Syndicate, were not granted to the general public. The promotional brochure published by Lake Shore Estates Company which was introduced into evidence states, "The lake is reserved for the convenience and pleasure of the property owners in Lake Shore Estates. No others are permitted to intrude except by invitation of the property owners." Paragraph 2 of the 1940 deed from Investors Syndicate to Jefferson County specifically provides that "said property shall not be used as a public park."

Further, in Stringer Realty Co. v. City of Gadsden, supra, this court said, viz:

"In 16 Am.Jur. p. 359, § 15, it is said: 'There is no such thing as a dedication between the owner and individuals. The public must be a party to every dedication. In fact, the essence of a dedication to public uses is that it shall be for the use of the public at large. There may be a dedication of lands for special uses, but it must be for the benefit of the public, and not for any particular part of it; and if from the nature of the user it must be confined to a few individuals * * * the idea of dedication is negatived. * * *'"

We conclude that the private nature of the alleged rights granted precludes a finding that this property has been dedicated as a public park.

■ Additionally, we note, that even if the deed from Investors Syndicate to Jefferson County was sufficient to constitute a dedication of this property to the public, this conveyance was made on the express condition that the County maintain the lake and dam, and in the deed it was expressly provided that in the event this condition was not met " * * * title to the property herein conveyed shall revert to and immediately vest in Investors Syndicate."

■ Dedications, like other types of conveyances may be made conditionally, and "Where the reasonable conditions imposed by the donor * * * are not complied with, he may revoke the dedication

and take possession of the dedicated premises * * *." 26 C.J.S. Dedication § 58, p. 546; Smith v. Duke, 257 Ala. 86, 57 So. 2d 550 (1952).

Thus, even were we to find that there had been a dedication to the public by the conveyance to the County, it would have been subsequently revoked by the grantor when the County failed to comply with the terms and conditions of the conveyance.

Appellees, however, seem to insist that while the property may not have been dedicated as a "public park" it has been dedicated as a "parkway." Appellees define "parkway" as property "dedicate[d] * * * to the public for park purposes but limit[ed] * * * as to public purposes, keeping the public off in order to preserve its beauty." Appellees apparently contend that a "parkway" is property which has been dedicated as a public park, but which the public is restricted from using.

So far as we can determine, there has been but one Alabama decision dealing with the meaning of the word "parkway." It is there stated:

"It is entirely within the functions of the *city* to provide sidewalks for pedestrians and a separate zone for vehicles, outlined by curbs, and to establish a zone or *parkway* between the two for ornamentation with grass or flower plots, trees and shrubs, a city beautiful feature, *for the benefit of the public and abutting owners.* * * *"* [Our emphasis] McCraney v. City of Leeds, 239 Ala. 143, 194 So. 151 (1940).

■ We are of the opinion that whatever distinctions there may be between public "parks" and "parkways," by definition, both must be "for the benefit of the public" at large, and open for the use and enjoyment of everyone, rather than for the use of those few individuals who own the adjoining property.

We are clear to the conclusion that no such public dedication has been shown by

appellees here. To the contrary, whatever the effect of the evidence, it would appear to point towards the creation of some sort of private easement or reservation in the lake for the use and benefit of the subdivision lot owners alone.

Although it is not entirely clear what appellees are contending for regarding this point, they seem to suggest that they have some sort of private easement in the property which precludes the property from being used for any of the purposes set out in paragraph 2. They also seem to say they have the right to have the property preserved in its natural state.

The deed from Lake Shore Estates Company, which was introduced in evidence as being representative of the deeds held by homeowners in Lake Shore Estates contained the following provision:

"The grantee herein will be granted equal privileges in the use of the lake known as Shades Lake, as granted to other lot owners in the Lucerne Sector of Lake Shore Estates * * *."

This provision is largely without meaning since there was nothing introduced in evidence which indicated what "privileges" the other owners enjoyed. Nor was there any evidence that any specific rights to use the lake were ever granted.

The only other possible basis for the argument that adjoining land owners were given some sort of private easement is certain statements in the promotional brochure published by Lake Shore Estates Company. The strongest of these statements is, viz: "The lake is reserved for the convenience and pleasure of the property owners in Lake Shore Estates." This statement, like the provision in the deed, grants no specific rights, and there is nothing in the evidence to indicate what sort of reservation was intended.

■ More significantly, however, is the fact that both of the above provisions refer to the lake, not the property. Even if these provisions were sufficient to create a

private easement, the easement could only apply to the use of the lake. There is no reference whatsoever to the rights of adjoining property owners in a private park or parkway. It is obvious that the only purpose for these provisions was to insure prospective purchasers in the subdivision of some sort of privilege in the use of the lake. The lake has now ceased to exist and cannot be restored.

In Pizitz-Smolian Co-operative Stores v. Randolph, 221 Ala. 458, 465, 129 So. 26, 32 (1930), this court held:

"* * * [T]he general rule is that 'an easement in a particular building, coupled with no interest in land, is extinguished by the destruction of the building'; but this is not the rule where the easement is coupled with an interest in the land. * * *"

We are of the opinion that this rule applies to a lake, as well as a building, and we agree with the general rule which is, that

"An easement granted for a particular purpose terminates as soon as such purpose ceases to exist, is abandoned, or is rendered impossible of accomplishment. * * *" 28 C.J.S. Easements § 54, p. 718; Atlantic & N. C. R. Co. v. Way, 172 N.C. 774, 90 S.E. 937 (1916); Shaw v. Williams, Tex.Civ.App., 332 S.W.2d 797 (1960).

Since appellees have failed to prove either a public dedication or a private easement, we are left with no alternative but to give effect to the express provisions of paragraph 5, viz:

"* * * if the * * * conditions * * * herein set forth are violated, the Investors Syndicate shall, at its option, have the right to declare this conveyance null and void * * * and *the rights* hereunder *of Jefferson County,*

said *owners of abutting property, and all other persons shall be immediately terminated and become null and void,* except that the terms, conditions, limitations and restrictions set forth in paragraph two shall be and remain in full force and effect." [Our emphasis]

We hold that title to the property reverted to Investors Snydicate upon the failure of the County to maintain the lake, and that such reversion rendered null and void paragraphs 1 and 3, setting out the affirmative duties of the grantee. Therefore, the trial court erred in holding that Howard College was under obligation to beautify the property and maintain it as a parkway as required by paragraph 1.

In appellants' remaining argument, they insist that the trial court erred in holding that the college is bound by the negative covenant (paragraph 2) prohibiting use of the property for any purpose other than a parkway. In the light of our conclusion that the affirmative covenant in paragraph 1 is not enforceable, and that the college is not obligated to beautify the property or maintain a parkway on it, we do not think that the negative restrictions against the use of the property can, or should, be enforced. To enforce the negative covenant of paragraph 2, while not enforcing the affirmative covenant of paragraph 1 would, in effect, mean that the property could never be put to any constructive use. The college would not be obligated to maintain a parkway on the property, but it would be prohibited (under the express terms of paragraph 2) from using the property for any other useful purpose.

"* * * It appears well settled that restrictions which amount to a prohibition of use of the property granted are void. Thompson on Real Property, Section 3363 * * *. * * *" Baker v. Henderson, 137 Tex. 266, 153 S.W.2d 465, 471 (1941).

In Moseby v. Roche, 233 Ala. 280, 282, 171 So. 351 (1936), this court held:

"Parties may for value voluntarily bind themselves as to the use of their property in some reasonable limited respect, which is not in general restraint of trade, *or of substantially all legitimate uses of their property.* * * *" [Our emphasis]

Since the college is not obligated to maintain a parkway on the property, the negative restrictions literally amount to a prohibition against "substantially all legitimate uses of their property." We note the negative provisions of paragraph 2 prohibit: Use as a public park, use as a place of amusement or entertainment, boating, swimming, hunting, fishing, structures, buildings, picnicking, camping, residences, businesses, and parking. Virtually everything one could do on the property is prohibited, save walking and talking, and the public would be prohibited from these uses.

Unless the college should voluntarily assume the burden of maintaining a park, the property would lie idle as "wild lands," becoming covered with rank undergrowth and weed-choked marshes. Rather than an area of aesthetic appeal, the property might well become an eyesore and possibly a health hazard as well.

Likewise, we think the negative covenant was such an integral part of, and so intermingled with and dependent upon, the affirmative covenants, that without them it cannot stand alone. Paragraph 2 makes repeated references to the lake and activities prohibited thereon. The only obvious conclusion which can be drawn as to the purpose of the negative covenant is that it was included in the instrument to supplement and strengthen the affirmative covenants relating to maintenance of the lake. When they were terminated by the reverter (by the express terms of the deed) and when the lake ceased to exist, the reason for the existence of the negative covenant ended.

It seems abundantly clear that the intent of the grantor in including paragraph 2 in the deed was to provide that the lake should remain as a scenic attraction, without any boating, water sports, amusements, camping or residences permitted on the lake. With the lake gone, the purpose of paragraph 2 fails.

The decree of the trial court must therefore be reversed and remanded for entry of a decree in conformity herewith.

Reversed and remanded.

HEFLIN, C. J., and MERRILL, HARWOOD, MADDOX and McCALL, JJ., concur.

COLEMAN, J., dissents.