[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 485 
Paul E. Lefebvre ("Lefebvre") and Patricia R. Lefebvre (hereinafter collectively referred to as "the Lefebvres") sued Warren D. Blackburn ("Blackburn") and his wife, Kathleen A. Berube, in October 2005, seeking, among other relief, a judgment declaring the rights of the parties to access and use a boat slip and pier owned by and adjacent to real property owned by Blackburn and Berube (hereinafter collectively referred to as "the Blackburns"). The Blackburns counterclaimed, seeking, among other things, certain declaratory relief.
The trial court conducted an ore tenus hearing on October 17, 2006. On November 16, 2006, the trial court entered an order resolving the claims for declaratory relief. The trial court certified the November 16, 2006, order as final pursuant to Rule 54(b), Ala. R. Civ. P. The Blackburns timely appealed the trial court's judgment to our supreme court, which transferred the appeal to this court, pursuant to § 12-2-7(6), Ala. Code 1975.
 Factual and Procedural Background
The central issue in this appeal is whether the Lefebvres have a right to access and use a boat slip and pier that extends from the Blackburns' real property into Palmetto Creek. The evidence received by the trial court showed the following relevant facts. In 1998, Mary Marler ("Marler") and her now deceased husband created a family subdivision of three contiguous lots. Only one of the lots, parcel A, was adjacent to Palmetto Creek. Parcel B was between parcel A and the third lot, parcel C, which was adjacent to parcel B and to a public road. The deeds to the three lots each include an easement ("the common easement") that provided the respective property holders access to the public road and to Palmetto Creek. The common easement is not at issue in this dispute.
After the creation of the family subdivision, Marler and her husband retained ownership of the waterfront lot, parcel A. The Marlers sold parcel B to Marler's son Tracey L. Thompson and his wife Beverly *Page 486 
J. Thompson. The Marlers sold parcel C to Marler's sister, Barbara Gail Belew, and her husband Michael Belew. The Marlers built a pier and boat slip on parcel A, and they allowed their family members to use those structures.
On May 10, 2004, the Lefebvres, who are not related to the Marlers, purchased parcel B from the Thompsons. On that same date, the Lefebvres also entered into an agreement ("the boat-slip agreement") with Marler, [1] the Thompsons, and the Belews that specified that the Lefebvres would have certain rights relating to the use of the pier and boat slip located on parcel A. Specifically, the boat-slip agreement provided:
 "AGREEMENT RE: ACCESS AND USE OF BOAT SLIP
 "Comes now, PAUL E. LEFEBVRE, and PATRICIA R. LEFEBVRE, hereinafter referred to as `Purchasers' and TRACEY L. THOMPSON and BEVERLY J. THOMPSON, hereinafter referred to as `Sellers', MARY MARLER, MICHAEL CHARLES BELEW and BARBARA GAIL BELEW, hereinafter referred to as `Owner' and would enter into this agreement to grant to the Purchasers of that certain real property located at 8649 Escambia Avenue, Elberta, Alabama the right to use a boat slip located on property owned by Mary Marler, Michael Charles Belew, Barbara Gail Belew and/or Tracey L. Thompson and Beverly J. Thompson.[2]
 "The parties agree that the Purchasers shall be entitled to an easement to access and use the existing boat slip currently being used by the Sellers. This right shall accrue only to the benefit of the Purchasers and shall be non-assignable by them and shall not run with the property. Any improvements or alterations to the easement for access to the boat slip, or to the boat slip itself shall require the approval, in writing, of all owners of the property over which the easement runs and where the boat slip is constructed. Purchasers agree to have all owners of the property over which the easement and boat slip runs to sign an agreement to this effect.
 "SEE EXHIBIT `A' ATTACHED HERETO AND MADE A PART HEREOF.
 "The Purchasers agree to pay the sum of Two Hundred Dollars ($200.00) per annum to Marler. Said payments are to be due on or before October 1st of each year, commencing with October 1, 2004.
 "This `Family Subdivision' was established with the understanding that all three owners will have equal access to easement, dock and boat slips.
 "Executed on this the 10th of May, 2004."
(Capitalization in original.)
At the time the Lefebvres purchased parcel B and the house located on that property, Marler had not built a house on parcel A, and the Belews had not built a house on parcel C. At the hearing before the trial court, Lefebvre testified that, before he purchased parcel B, he discussed the use of the pier and boat slip with Tracey Thompson and that he demanded "something" from Tracey Thompson in writing that would guarantee the Lefebvres' right to use the pier and boat slip. Lefebvre explained that the only reason the Lefebvres purchased parcel B was so that they could use the boat slip. Tracey Thompson acknowledged that the Lefebvres were only interested in purchasing parcel B if they also obtained the accompanying *Page 487 
right to use the pier and boat slip. The boat-slip agreement, which specified that the rights conveyed in that agreement were also subject to the common easement, was recorded in the probate records of Baldwin County.
After the Lefebvres purchased parcel B in May 2004, the Lefebvres used the pier and boat slip. In October 2004 they paid Marler $200 pursuant to the terms of the boat-slip agreement. The Lefebvres also left some of their personal property on the pier itself or upon the real property they traversed in order to use the pier.
In September 2004 Hurricane Ivan damaged the pier. The Lefebvres repaired the pier. Although the Lefebvres did not obtain permission from Marler (or the other parties to the boat-slip agreement) before conducting those repairs, Marler did not object to them.
In April 2005, the Blackburns purchased parcel A from Marler.[3] The Blackburns knew of the existence of the boat-slip agreement before they purchased parcel A. In order to alleviate the Blackburns' concerns, Marler executed an affidavit that stated, among other things, that Marler intended to give the Lefebvres a license to use the pier and boat slip[4] and that it was not her intent to create an easement in favor of the Lefebvres. Marler also testified at the hearing that she intended only to grant the Lefebvres a license. However, on cross-examination, Marler admitted that she did not know the difference between a license and an easement and that she thought a license and an easement were "virtually the same thing."
The warranty deed by which Marler conveyed parcel A to the Blackburns contained a description of the boundaries of parcel A, including the pier and boat slip, as well as the description of the common easement. When the Blackburns obtained title insurance to the property, the insurance company excluded the pier and boat slip from coverage.
According to Lefebvre, after the Blackburns purchased parcel A, the Blackburns denied his right to use the pier and boat slip. Blackburn testified that, initially, he gave the Lefebvres permission to use the pier and boat slip but that he revoked that permission when the dispute among the parties arose.
Over the Memorial Day weekend in May 2005, the parties had a discussion in which the Lefebvres told the Blackburns that they wanted to build a separate pier on the Blackburns' property and into Palmetto Creek. The Blackburns informed the Lefebvres that they did not want another pier on their property. In July 2005, when the Blackburns and their daughters arrived at their house on parcel A for the Fourth of July weekend, they discovered that Lefebvre had removed the deck boards on the pier but that he had left the structural supports for the pier in place. During the hearing, the trial court stopped the parties' attempts to present evidence regarding that incident. The trial court indicated that it recalled testimony on that issue taken at an earlier hearing on a petition for a preliminary injunction. The record does not contain a transcript of that *Page 488 
earlier hearing, and, therefore, the details of the incident are not before this court. Although it is clear that at the time of the hearing the deck boards on the pier had been replaced, the record does not indicate which party replaced the deck boards.
At the October 17, 2006, hearing, the Blackburns presented evidence indicating that the Lefebvres had not paid them the $200 annual payment referenced in the boat-slip agreement for the years 2005 and 2006. Tracey Thompson testified that he insisted that the boat-slip agreement require the annual payment to Marler to help Marler defray the costs of property taxes on parcel A. Lefebvre testified that he believed that the provision of the boat-slip agreement requiring him to pay $200 per year was only effective as long as Marler owned the property. Marler also testified that she believed that that provision applied for as long as she owned the property. Lefebvre testified that he had not paid, and did not intend to pay, the Blackburns for the use of the pier and boat slip.
The Blackburns also attempted to demonstrate that the Lefebvres violated the terms of the boat-slip agreement by "assigning" their rights under that agreement. The record indicates that Lefebvre allowed a friend, Thomas Bailey, to use the boat slip while repairs were being made to Bailey's own, storm-damaged boat slip.
The trial court's November 15, 2006, judgment stated, in relevant part:
 "It is hereby ORDERED, ADJUDGED, DECREED that:
 "1. On April 13, 2005, [the Blackburns] purchased Parcel A in the family subdivision, including the pier, from Mary E. Marler as demonstrated by a warranty deed marked as [the Blackburns'] Exhibit J. [The Blackburns] own the pier in fee simple.
 "2. According to [the Blackburns'] Exhibit 5 executed on May 10, 2004, [the Lefebvres] have the right to use the existing boat slip on the south side of [the Blackburns'] pier as long as [the Lefebvres] own Parcel B in the Family Subdivision and are living. [The Lefebvres'] right to use the south boat slip is not assignable, conveyable, or inheritable.
 "3. However, [the Lefebvres] must pay [the Blackburns] $200 per year in consideration for the right to use the pier. Said payments are due on or before October 1st of each year, commencing with October 1, 2007.
 "4. [The Lefebvres'] right to use the pier was not extinguished or terminated when Hurricane Ivan substantially destroyed the pier on or about September 16, 2004.
 "5. [The Lefebvres'] right to use the pier was not extinguished or terminated when Mary E. Marler sold Parcel A and the pier to [the Blackburns] on April 13, 2005.
 "6. [The Lefebvres'] right to use the pier was not extinguished or terminated when [the Lefebvres] intentionally removed all the pier boards on or about June 30, 2005.
 "7. [The Lefebvres'] right to use the pier was not extinguished or terminated when [the Lefebvres] assigned the right to use the south boat slip to [Lefebvre's friend,] Thomas Bailey.
 "8. [The Lefebvres'] right to use the pier was not extinguished or terminated when [the Lefebvres] failed to pay [the Blackburns] $200 on or before October 1, 2005, and on or before October 1, 2006.
 "9. [The Lefebvres] do not have a right to use or interfere with the boat slip on the north side of the pier. *Page 489 
 "10. [The Lefebvres] must remove the pier box and all other fixtures they have installed on [the Blackburns'] pier. [The Lefebvres] do not have the right to rebuild, repair, alter, or modify the pier or the boat slips.
 "11. [The Blackburns] do not have an obligation to rebuild the pier if the pier is substantially damaged by a hurricane or other natural forces.
 "12. [The Blackburns] do have an obligation to perform general maintenance of the pier.
 ". . . .
 "16. [The Lefebvres] cannot leave their boats, kayaks, or other watercraft in the waters of Palmetto Creek adjacent to Parcel A in the Family Subdivision for any amount of time, except to the extent that [the Lefebvres] have the limited right to use the south boat slip as set forth herein."
 Analysis
Our supreme court recently stated the appropriate standard of review as follows:
 "`"Where evidence is presented to the trial court ore tenus, a presumption of correctness exists as to the court's conclusions on issues of fact; its determination will not be disturbed unless it is clearly erroneous, without supporting evidence, manifestly unjust, or against the great weight of the evidence."' Pollard v. Unus Props., LLC, 902 So.2d 18, 23 (Ala. 2004) (quoting American Petroleum Equip. Constr., Inc. v. Fancher, 708 So.2d 129, 132 (Ala. 1997)). `However, as to issues of law, or "where there are no disputed facts and where the judgment is based entirely upon documentary evidence, no such presumption of correctness applies; our review is de novo."' Padgett v. Conecuh County Comm'n, 901 So.2d 678, 685
(Ala. 2004) (quoting Alfa Mut. Ins. Co. v. Small, 829 So.2d 743, 745 (Ala. 2002)). Moreover, no presumption of correctness attaches to the trial court's conclusions of law or to its improper application of law to the facts. American Petroleum Equip., 708 So.2d at 132."
Weeks v. Wolf Creek Indus., Inc., 941 So.2d 263,268-69 (Ala. 2006). With those general principles in mind, we now turn to the specific issues raised by the Blackburns.
 I.
The Blackburns contend that the boat-slip agreement created a license that could be revoked. The Lefebvres contend that the boat-slip agreement created an easement in their favor. The trial court's judgment did not specify whether the boat-slip agreement created a license or an easement, but it occasionally referred to the interest created by the boat-slip agreement as an "easement." We note that regardless of the nature of the right created by the boat-slip agreement, this court may affirm a correct judgment for any reason, even if the trial court did not rely on that reason in reaching its judgment. BamaBudweiser of Montgomery, Inc. v. Anheuser-Busch, Inc.,611 So.2d 238 (Ala. 1992); Cove Props., Inc. v. Walter TrentManna, Inc., 702 So.2d 472, 474 (Ala.Civ.App. 1997).
Concerning the proper interpretation of agreements creating licenses or easements, we note the following general principles. First, "`[t]he construction of a written document is a function of the court.'" Jehle-Slauson Constr. Co. v. Hood-Rich,Architects Consulting Eng'rs, 435 So.2d 716, 720
(Ala. 1983) (quoting Wheeler v. First Alabama Bank ofBirmingham, 364 So.2d 1190, 1194 (Ala. 1978)). "In the absence of fraud or mistake, it is only where the instrument is doubtful of meaning, or its language ambiguous, *Page 490 
that the court may look beyond the `four corners' of the instrument to give clarity and specificity of meaning."Camp v. Milam, 291 Ala. 12, 16-17, 277 So.2d 95, 98
(1973); see also David Lee Boykin Family Trust v.Boykin, 661 So.2d 245, 251 (Ala.Civ.App. 1995) ("The substantive rules governing licenses are the same as those governing contracts.").
The critical factor in determining whether parties created an easement or a license is the parties' intent. James v.Brewster, 954 So.2d 594, 600 (Ala.Civ.App. 2006) (citingBoyce v. Cassese, 941 So.2d 932, 941 (Ala. 2006)). In determining whether the parties created an easement or a license, we also look to the surrounding circumstances. SeeDrummond Co. v. Walter Indus., Inc., 962 So.2d 753
(Ala. 2006) (citing Jon W. Bruce and James W. Ely, Jr., TheLaw of Easements Licenses § 11:1 (West 2001)).
Concerning the distinction between easements and licenses, we note that, on the one hand, "[n]onpossessory property rights such as covenants and easements are said to `run with the land,' becoming an incident of ownership, and they are generally not personal." Budget Inn of Daphne, Inc. v. City ofDaphne, 789 So.2d 154, 159 (Ala. 2000). In contrast, "[a] license denotes the `giving of one's consent' to do or perform a specified activity; a license is a personal privilege and is generally revocable at the will of the licensor." Wehby v.Turpin, 710 So.2d 1243, 1251 (Ala. 1998) (citing Camp v.Milam, 291 Ala. at 17, 277 So.2d at 99).
Our supreme court has adopted the following language of Jon W. Bruce James N. Ely, Jr., The Law of Easements Licenses in Land § 11:1 (West 2001), to explain the distinction between easements and licenses and the factors to consider when determining the nature of the interest created by the parties:
 "`§ 1:4 — Fundamental difference
 "`A license is often defined as permission to do an act or a series of acts on another's land that, absent authorization, would constitute trespass. Because permission is the voluntary grant of a personal privilege, the landowner may usually revoke consent at any time and thereby terminate the license. Given their revocable nature, licenses generally are not considered to reach the status of interests in land. In contrast, easements are irrevocable interests in land of potentially perpetual duration.
 "`Several distinctions flow from this fundamental difference. An express easement must be in writing to satisfy the Statute of Frauds; a license may be, and often is, given orally. Easement holders are entitled to protection from interference from third parties; licensees generally are not. Most easements are transferable; licenses are not transferable unless the parties intended otherwise.
 "`. . . .
 "`§ 1:5 — Intent of parties
 "`All of the legal distinctions between easements and licenses mentioned in the preceding section only hint at how one can decide which right was created. The critical factor is the parties' intent. The following elements are important in ascertaining intent:
 "`1. Manner of creation of right (oral or written). The mere granting of a right in writing does not automatically render it an easement. . . . [M]ore is required to create an easement. The existence or absence of words that are "ordinarily used in the conveyances of real estate" is an important factor. The label that the parties give the right, however, does not dictate its legal effect For example, a right *Page 491 called a lease may in reality be an easement or a license.
 "`2. Nature of right created. The creation of a right to be used in a particular portion of the servient estate indicates that an easement was intended. Likewise, the existence of authority in the holder of the right to maintain or improve the burdened property suggests an easement.
 "`3. Duration of right. A set duration indicates an easement. A grant in perpetuity also indicates an easement. Further, an express provision that the right benefits its holders' successors and assigns supports the conclusion that an easement was intended. Similarly, an easement is indicated if the right expressly binds the servient landowner's successors and assigns. Conversely, the deletion of words of succession may indicate a license. Finding an easement, however, does not depend upon the existence of "magic words such as `successors and assigns.'"
 "`4. Amount of consideration, if any, given for right. Substantial consideration indicates an easement. In this regard, it is necessary to distinguish consideration given for the right from money expended in reliance upon the right. An "irrevocable license" may result from expenditures made in reliance on an existing license.
 "`5. Reservation of power to revoke right.
An express reservation of the power to cancel, revoke, or terminate the right may be considered to indicate a license. However, a power to terminate in the landowner does not necessarily mean that a license was created. Specifying a power to terminate for a particular reason or in limited circumstances may be seen as inconsistent with the unabridged right to revoke retained by one who grants a license. Moreover, an easement may be expressly subject to termination by the servient owner upon the occurrence of a specified event.'"
Boyce v. Cassese, 941 So.2d at 941-42 (emphasis added).
In Boyce v. Cassese, supra, our supreme court applied the above factors to the facts of that case and concluded:
 "The agreement as amended contains words typical of a conveyance of an interest in land; the Golf Club was granted the right to use a portion of the property for golf tournaments in exchange for the promise to maintain and improve that property and to provide liability insurance covering the property during the tournaments; the agreement indicated that the rights and obligations granted in it were to run with the land and that they were binding upon the parties' successors and assigns; and the Casseses, as the owners of the servient estate, did not reserve the right to cancel or terminate the Golf Club's rights under the agreement. All of these factors indicate an intent to create an easement rather than a license."
Boyce v. Cassese, 941 So.2d at 942.
In James v. Brewster, 954 So.2d at 600, this court applied the Boyce v. Cassese factors quoted above and concluded:
 "With regard to James's use of the concrete driveway, the amendment merely states, `The seller agrees that the existing driveway may be used by both parties (the Grantor and the Grantee).' Thus, the amendment neither characterizes James's use of the concrete driveway as an easement nor uses the traditional language used to convey an interest in real property. The language is more consistent with a grant of permission to use the concrete driveway *Page 492 
than a grant of an interest in real property."
The boat-slip agreement uses the term "easement" at least four times in referencing the right that was the subject of that agreement. However, the language used by the parties to an agreement is not dispositive in determining the nature of the rights created by that agreement. See Boyce v.Cassese, 941 So.2d at 941-42 (holding that an easement was created by a document despite the fact that the document stated that the grantors were conveying a license to use a strip of land); see also 25 Am.Jur.2d Easements and Licenses
§ 117 (2004) (stating that in determining "whether a transaction is a license or a lease, a court is not bound by the characterization of the parties").
Aside from its use of the term "easement," the boat-slip agreement also stated that the parties were creating a "right touse a boat slip" and specified that "[t]his right shall accrue only to the benefit of [the Lefebvres] and shall be non-assignable by them and shall not run with the property." (Emphasis added.) Additionally, the boat-slip agreement required the Lefebvres to obtain the permission of the other property owners before making improvements or alterations to the pier or boat slip. Those requirements tend to indicate that the right created by the boat-slip agreement was personal in nature as to the Lefebvres.
The testimony of the parties also establishes that the Lefebvres use of the pier and boat slip was intended to be personal to them and that the parties intended that the Lefebvres have no right to transfer or convey their right to use the pier and boat slip and that the interest conferred not run with the land. Given the language of the boat-slip agreement and the parties' testimony regarding their intent, we conclude that the boat-slip agreement created a license rather than an easement.
Our analysis does not end here, however, because under certain circumstances a license may become irrevocable. Our supreme court summarized the evolution of irrevocable licenses as follows:
 "To prevent possible injustice the law began to recognize that the giving of one's permission to another for the doing of certain acts with respect to the property of the former did not necessarily carry with it the unlimited right to withdraw the consent. The concept was broadened to look upon the license not merely as the giving of consent, but, in certain instances, the conferring of a legal right — a license coupled with an interest."
Camp v. Milam, 291 Ala. at 17, 277 So.2d at 99
(footnote omitted). The court in Camp v. Milam, supra, continued:
 "Thus, when expenditures contemplated by the licensor have been made by the licensee, the license, having been acted upon so as to greatly benefit the licensor, is said to have been executed. An executed license, for reasons founded upon the equitable principle of estoppel, becomes irrevocable and confers upon the licensee a substantive equitable right in the property."
291 Ala. at 18, 277 So.2d at 99 (footnote omitted). The "equitable principle of estoppel" described in Camp v.Milam has been recognized in Alabama since at least 1859, when our supreme court stated:
 "It would be against all conscience to permit the defendant to revoke his license, after the plaintiff had acted upon it so far that great damage must necessarily result from the revocation. Every reason upon which the doctrine of estoppels in pais rests, applies. It is a plain case, where one party has, by his conduct, induced another to act in such a *Page 493 
manner, that he cannot be allowed to retract without serious injury to that other person. We think a denial of the right of revocation, under such circumstances, is consistent with justice and right, supported by the analogies of the law, and many respectable decisions."
Rhodes v. Otis, 33 Ala. 578, 600-01 (1859).
In this case, all the owners of the parcels in the family subdivision signed the boat-slip agreement. The boat-slip agreement was executed on the same date the Lefebvres purchased parcel B, and it was subsequently recorded in the probate records of Baldwin County. Lefebvre testified that the reason the Lefebvres purchased parcel B from the Thompsons was in order to acquire the right to use the pier and boat slip; in his testimony, Tracey Thompson acknowledged that fact. Tracey Thompson understood that the Lefebvres relied on the boat-slip agreement to purchase parcel B. However, Marler insisted that she intended that the Lefebvres have the right to use the pier and boat slip only for as long as she owned parcel A, which was for sale at the time the boat-slip agreement was executed. Marler testified that she did not inform the Lefebvres of that intent at the time she signed the boat-slip agreement. The Lefebvres' attorney questioned Marler regarding whether it was reasonable that the Lefebvres would purchase parcel B under those conditions, and Marler responded that she did not know how to answer that question. The trial court could have resolved that question in favor of the Lefebvres.
Further, although we have not interpreted the boat-slip agreement as creating an easement, that agreement, in several places, refers to the right conferred as an "easement." Thus, the language of the boat-slip agreement indicates that the parties intended to create an interest that was greater, or more permanent in nature, than a revocable license.
The evidence supports a conclusion that Marler contemplated that the Lefebvres would rely upon the license afforded them pursuant to the terms of the boat-slip agreement to make certain expenditures, specifically, the purchase of parcel B. SeeCamp v. Milam, supra. The evidence also supports a finding that Marler benefited from the Lefebvres' reliance upon the license when her son was able to sell his property, when the Lefebvres rebuilt the damaged pier and boat slip, and when she received the $200 payment called for under the boat-slip agreement. Given the facts of this case, we conclude that the evidence supports a conclusion that Marler knew that the Lefebvres purchased parcel B in reliance on the license created by the boat-slip agreement. We also conclude that the evidence of the Lefebvres' reliance on the license conveyed by the boat-slip agreement, together with Marler's knowledge of that reliance, sufficiently supported the trial court's conclusion that the license was "executed" such that it could not be revoked. See Camp v. Milam, 291 Ala. at 18,277 So.2d at 99. Consequently, the Lefebvres have a "substantive equitable right in the property," and it "`would be against all conscience'" to allow the license to be revoked. Id.
(quoting Rhodes v. Otis, 33 Ala. at 600).
Several Alabama cases have held that an irrevocable license, because it is personal in nature, does not run with the land. InCamp v. Milam, supra, after determining that an irrevocable license had been created between the parties to that case, the court stated:
 "We further hold that this license of the Milams, although irrevocable, is by its very nature personal; and, being a personal right, it is not an interest which attaches to or runs with the land, nor *Page 494 
can it be assigned, conveyed or inherited. Neither can the use of the lake under this license ever ripen into an easement by prescription, however long continued. Kirkland [v. Kirkland, 281 Ala. 42, 44, 198 So.2d 771, 772 (1967)]."
291 Ala. at 19, 277 So.2d at 100. See also Wehby v.Turpin, 710 So.2d at 1251; and Shearer v.Hodnette, 674 So.2d 548, 551 (Ala.Civ.App. 1995) ("Although irrevocable, the license during the lifetime of the Hodnettes is by its nature personal. It is not an interest which runs with the land, nor can it be assigned, conveyed, or inherited."). Importantly though, the above statements in Camp v.Milam, supra, and Shearer v. Hodnette, supra, were not made in the context of a dispute between a licensee and a successor to a licensor, as we are faced with in the present case. Instead, those disputes concerned the original licensee and licensor, and thus although the above statement clarified the rights of the parties to the case, it is not determinative in the present case. Our research has not shown that the Alabama courts have been called upon to determine the rights of the holder of an irrevocable license as against a successor in title to the licensor who took the property with notice of the license. We, therefore will look to the law of other states for guidance on this issue.
In Florida, "a subsequent vendee having notice of the licensee's use at the time of purchase takes the land burdened with the license, and has no right to object to its presence or to sue for or recover damages therefor." Tatum v.Dance, 605 So.2d 110, 112 (Fla.Dist.Ct.App. 1992). The Pennsylvania Superior Court has addressed the issue as follows:
 "The Pennsylvania Supreme Court adopted the equitable doctrine of irrevocable license in the mid-nineteenth century stating that `a license to do something on the licensor's land when followed by the expenditure of money on the faith of it, is irrevocable, and is to be treated as a binding contract.' Huff v. McCauley, 53 Pa. 206, 208 (1866); Kovach v. General Telephone Co., 340 Pa.Super. 144, 489 A.2d 883, 885 (1985). The Court subsequently explained that such a license,
 "`while not strictly an easement, is in the nature of one. It is really a permission or license, express or implied, to use the property of another in a particular manner, or for a particular purpose. Where this permission has led the party to whom it has been given, to treat his own property in a way in which he would not otherwise have treated it . . . it cannot be recalled to his detriment.'
 "Harkins v. Zamichieli, 266 Pa.Super. 401, 405 A.2d 495, 498 (1979) (quoting Pierce v. Clelland, 133 Pa. 189, 19 A. 352 (1890)). Thus, the irrevocable license gives `absolute rights, and protects the licensee in the enjoyment of those rights.' Cole v. Ellwood, 216 Pa. 283, 289, 65 A. 678, 680 (1907). Moreover, `successors-in-title take subject to an irrevocable license if they had notice of the license before the purchase.' Kovach, supra (quoting Harkins, supra at 498)."
Morning Call, Inc. v. Bell Atlantic-Pennsylvania,Inc., 761 A.2d 139, 144 (Pa.Super.Ct. 2000) (emphasis added) (holding that "[s]ubsequent owners . . . took the property subject to the irrevocable license"); see also Loid v. Kell,844 S.W.2d 428, 430 (Ky.Ct.App. 1992) (citing Holbrook v.Taylor, 532 S.W.2d 763 (Ky. 1976), for the proposition that the irrevocability of a license does not travel with the land upon which the license is located and that it must pass, if at all, by equitable principles to the subsequent owner). The foregoing is reflected in commentary as well: *Page 495 
 "A license which, because of its being executed, is irrevocable against the licensor, is also irrevocable as against a purchaser from the licensor with notice unless the licensee is by his or her own acts estopped to assert such irrevocability."
53 C.J.S. Licenses § 144 (2005) (footnotes omitted).
In this case, the Lefebvres recorded the boat-slip agreement in the probate court office. Further, the evidence demonstrates that the Blackburns obtained from Marler, before she conveyed parcel A to them, an affidavit indicating that she intended that the boat-slip agreement confer on the Lefebvres a license to use the pier and boat slip. Thus, the Blackburns purchased parcel A with at least knowledge of the boat-slip agreement. Given the facts of this case, we conclude that the license created by virtue of the boat-slip agreement was also irrevocable by the Blackburns.
 II.
The Blackburns argue in the alternative that certain facts "destroyed" the Lefebvres interest created by the boat-slip agreement. Citing Chatham v. Blount County,789 So.2d 235, 241 (Ala. 2001), and other cases, the Blackburns assert that the "easement" in this case was abandoned because the acts of the Lefebvres rendered the use of the pier and boat slip impossible or "obstructed it in a manner inconsistent with its further enjoyment."
In Chatham, our supreme court held that a railroad company's removal of the rails, cross-ties, and track material constituted an abandonment of its easement. In Byrd Cos. v.Smith, 591 So.2d 844, 848 (Ala. 1991), our supreme court affirmed a trial court's judgment that held that an easement was abandoned when a building was constructed over the easement. We note that "`[t]he essence of the inquiry of abandonment vel non of an easement by the owner is his intention.'"McCulloch v. Roberts, 290 Ala. 303, 307, 276 So.2d 425,428 (1973) (quoting Western Union Tel. Co. v. Louisville N.R. Co., 206 Ala. 368, 370, 89 So. 518, 518 (1921)).
Although those cases address easements, we apply the general theory of those cases in considering whether the interest created by the boat-slip agreement was abandoned or destroyed.See Hausman v. Brown, 201 Ala. 331, 333, 77 So. 993,995 (1918) (our supreme court has indicated that some licenses may be "in the nature of an easement, which would be irrevocable"); and Morning Call, Inc. v. BellAtlantic-Pennsylvania, Inc., 761 A.2d at 144 (stating that "a license may become irrevocable under the rules of estoppel and in those circumstances it is similar to an easement").
The Blackburns argue that the Lefebvres' rights under the boat-slip agreement were abandoned or destroyed because Lefebvre removed the deck boards from the pier. However, the trial court heard evidence on that issue, much of which was not transcribed for this court's review, and it determined that the removal of the deck boards did not destroy the Lefebvres' rights under the boat-slip agreement. "`"Where evidence is presented to the trial court ore tenus, a presumption of correctness exists as to the court's conclusions on issues of fact; its determination will not be disturbed unless it is clearly erroneous, without supporting evidence, manifestly unjust, or against the great weight of the evidence."'" Weeks v. WolfCreek Indus., Inc., 941 So.2d at 268. The trial court was presented with the ore tenus evidence, and we will not reweigh its factual conclusion that the removal of the deck boards did not equate to an abandonment *Page 496 
of the Lefebvres' right to access Palmetto Creek or to use the pier or boat slip. Further, "testimony . . . not present in the record either as a transcript or as a Rule 10(d) summary . . . continues to be conclusively presumed . . . [to be] sufficient to support affirmance." Adams v. Adams, 335 So.2d 174,177 (Ala.Civ.App. 1976). We cannot say that the Blackburns have demonstrated that the trial court erred in refusing to find that Lefebvre's removal of the deck boards demonstrated an intent to abandon, or was in fact an abandonment, of the Lefebvres' rights under the boat-slip agreement.
The Blackburns also assert that a purported "breach" of the boat-slip agreement by the Lefebvres terminated any right they have to use the pier and boat slip. According to the Blackburns, when the Lefebvres failed to obtain written permission from Marler before rebuilding the pier and boat slip after Hurricane Ivan, they breached the agreement. However, those repairs were performed before the Blackburns purchased parcel A. Thus, it appears that the Blackburns do not have standing to object to any oral modification of the license agreement made between Lefebvre and Marler in regard to the repairs to the pier and boat slip. Russell v. Birmingham Oxygen Serv., Inc.,408 So.2d 90, 93 (Ala. 1981) ("[a] third person has no rights under a contract between others unless the contracting parties intend that the third person receive a direct benefit enforceable in court"); Stockton v. CKPD Dev. Co.,936 So.2d 1065, 1077 (Ala.Civ.App. 2005) (citing Ex parteIzundu, 568 So.2d 771, 772 (Ala. 1990), for the proposition that as a general rule a litigant may not claim standing to assert the rights of a third party).
Additionally, the testimony of Lefebvre was that Marler did not object when he told her he was going to rebuild the pier and boat slip after Hurricane Ivan. Consequently, the evidence supports a conclusion that Marler waived the requirement that the Lefebvres obtain permission before performing repairs or that Marler agreed to a modification of the contract terms.See Duncan v. Rossuck, 621 So.2d 1313, 1315 (Ala. 1993) (noting that under Alabama law a written agreement may be modified by a subsequent oral agreement of the parties unless some statutory provision provides otherwise and that such modification may occur even when the contract contains a requirement that all modifications be in writing).
The Blackburns also argue that the Lefebvres breached the boat-slip agreement when they allowed a third party to store his boat at the boat slip. The Blackburns contend that this act constituted an assignment of the Lefebvres' rights that was not permitted under the terms of the boat-slip agreement. "There has been an assignment (1) if the assignor intended to transfer a present interest in the subject matter of the contract, [Baker v. Eufaula Concrete Co., 557 So.2d 1228, 1230
(Ala. 1990)], and (2) if the assignor and the assignee mutually assented to the assignment." DeVenney v. Hill,918 So.2d 106, 113 (Ala. 2005) (citing 6A C.J.S. Assignments
§ 73 (2004)). "Whether the assignor intended to transfer his or her interest is a factual issue to be determined under the circumstances of the case." DeVenney, 918 So.2d at 113
(citing Baker, 557 So.2d at 1230). Lefebvre testified that he understood the boat-slip agreement to mean that he could not assign the use of the boat slip to anyone when he sold the property. Lefebvre testified that he allowed Bailey to store his boat in the boat slip temporarily, during the period in which his own dock or boat slip was being repaired after it had been damaged by a storm. Accordingly, the trial court could *Page 497 
have determined that the Lefebvres did not intend to assign their rights under the boat-slip agreement based solely on Lefebvre's temporarily allowing a friend to use the slip.
The Blackburns finally contend that any right the Lefebvres had was destroyed when Hurricane Ivan damaged the pier or boat slip. Again, as noted above, the Blackburns do not appear to have standing to assert this argument because the damage occurred before they purchased parcel A. Assuming, for the sake of argument, that the Blackburns do have standing, we note that they rely primarily on Trustees of Howard College v.McNabb, 288 Ala. 564, 574, 263 So.2d 664, 673 (1972), andAmlea (Florida), Inc. v. Smith, 567 So.2d 981, 982
(Fla.Dist.Ct.App. 1990), for the proposition that if the pier was destroyed, any right to use the pier was also destroyed. Importantly though, in McNabb, the right the parties had was a right to use a lake; that lake "ceased to existand [could] not be restored." 288 Ala. at 574,263 So.2d at 673 (emphasis added). In Smith, the court stated in a two-paragraph opinion, without stating any facts, that "an easement in a building coupled with no interest in the land, such as [a] parking easement . . . is extinguished by the destruction of the building." 567 So.2d at 982.
In this case the Blackburns did not introduce evidence relating to the extent of the damage to the pier following the hurricane, and the trial court apparently found that the pier did not cease to exist. Additionally, Marler acquiesced to the reconstruction of the pier. The trial court did not exceed its discretion in determining that the purported "destruction" of the pier or boat slip by the hurricane did not terminate the Lefebvres' rights under the boat-slip agreement.
Based on the foregoing, we affirm the trial court's judgment.
AFFIRMED.
PITTMAN, BRYAN, and THOMAS, JJ., concur.
MOORE, J., concurs in the result, without writing.
[1] Marler's husband died in February 2002.
[2] It is not clear to this court why all these persons were listed as owners of the boat slip.
[3] We note that before the trial court the parties occasionally referred to parcel A as "parcel C." There is no dispute that the Blackburns' property was adjacent to Palmetto Creek. For the purposes of this opinion, we refer to the Blackburns' property as "parcel A."
[4] At the time of the hearing, two boat slips were in existence on the pier. The boat slip at issue in this action is the boat slip on the south side of the pier. The boat slip on the north side of the pier appears to have been constructed after the Blackburns purchased parcel A.