BRYAN, Judge.
Richard Knight (“Richard”) appeals from a judgment in favor of John Knox Manor, Inc. (“John Knox Manor”). We reverse and remand.

Factual Background and Procedural History

Richard’s mother, Susie Knight (“Susie”), began living in an independent-living apartment at a facility owned and operated by John Knox Manor (“the facility”) in 2003. Subsequently, she moved to an assisted-living unit at the facility. At some point before January 15, 2008, Susie required hospitalization and, when she was discharged from the hospital, she was moved into the nursing-home unit at the facility.
On January 15, 2008, shortly after Susie had been moved into the nursing-home unit, Richard met with Patricia Burnett, an employee of John Knox Manor who handles admissions to the nursing-home unit. The record indicates that, when Richard met with Burnett, Susie was incompetent to sign a contract, although the record does not contain any specific information regarding the cause of her incompetence *113 or its duration. No guardian or conservator had been appointed for Susie when Richard met with Burnett. Although Susie had executed a durable power of attorney (“the durable power of attorney”) appointing Richard her attorney-in-fact with the power to make health-care decisions for her and to pay for her health care if she should become incapacitated, Richard was not authorized to act on Susie’s behalf by the durable power of attorney when he met with Burnett on January 15, 2008, because the durable power of attorney conditioned the exercise of his powers as her attorney-in-fact on Susie’s incapacity being certified by two physicians and two physicians had not certified that she was incapacitated.
Burnett presented Richard with an admission contract (“the contract”), which John Knox Manor required Richard to sign as a “Responsible Party” as a condition of Susie’s admission to the nursing-home unit. On cross-examination, Burnett testified:
“Q. Was Mr. Knight required to sign the financial long-term care admission agreement in order for his mom to be admitted to the nursing home?
“A. Yes, sir, because she was not able.
“Q. The answer is yes?
“A. Yes, sir.
“Q. Did you explain to Mr. Knight that he wasn’t required to sign that agreement as a responsible party?
“A. No, sir, because I have never had anyone, you know. That was the policy. I didn’t know. That was it. I didn’t know. Someone had to sign it.
“Q. You didn’t tell him, no, Mr. Knight, you don’t have to sign this? Particularly the financial agreement, you did not tell him he did not have to sign that, did you?
“A. No, sir.”
In pertinent part, the contract provided:
“AGREEMENT OF PATIENT OR RESPONSIBLE PARTY:
[[Image here]]
“6. To pay the basic room and board rate agreed upon with the facility, at specified intervals.
[[Image here]]
“FINANCIAL AGREEMENT:
“The patient or responsible party agrees to pay $139.00 daily and the facility will accept this payment in full consideration for care and services rendered, as follows:
“TO BE PAID BY PATIENT OR RESPONSIBLE PARTY:
“1. Room, board, and nursing care $4,309.00
“2. Supplies varies
“3. Personal Laundry $45.00”
Richard signed the contract during his meeting with Burnett on January 15, 2008. The line for Richard’s signature was designated as the signature line for the “Resident/Sponsor/Responsible Party.” Burnett signed the contract on behalf of John Knox Manor.
Susie remained in the nursing-home unit at the facility until she died 22 months later. During the 22 months she was a resident in the nursing-home unit, Susie received monthly Social Security benefits, monthly retirement benefits from the Kansas Public Employees Retirement System, and monthly retirement benefits from the United States government; those benefits totaled $31,326.76.[1] In addition, the record indicates that Susie received dividends totaling $23.89 from Wachovia Corporation *114 in 2008*' The record contains no evidence regarding whether she received any dividends in 2009.
The record indicates that on February 5, 2008, Richard sold 450 shares of stock in Wachovia Corporation owned by Susie; however, the record does not contain any evidence indicating the amount of the proceeds that resulted from the sale of those 450 shares. The record indicates that, on June 16, 2008, Susie owned 22.124 shares of stock in Wachovia Corporation and that those shares had a value of $410.57 on that date. In June 2008, Richard sold 70 shares of stock in MetLife, Inc., owned by Susie and received a total of $4,715.86. In September 2008, Richard surrendered two MetLife policies on Susie’s life and received the cash-surrender value of those policies, which totaled $4,194.14. The record also indicates that Susie owned three shares of stock in Navistar International Corporation while she was in the nursing-home unit, but the record does not contain any evidence indicating the value of those shares.
The record also indicates that, before she became a resident in the nursing-home unit, Susie had opened a bank account at Regions Bank in her name and the name of her granddaughter and that she had deposited an unspecified sum of money in that account to be used for her granddaughter’s education, that an unspecified amount of funds belonging to the granddaughter were subsequently deposited into that account, and that Susie’s name was taken off of the account after she became a resident in the nursing-home unit.
In addition, the record indicates that, in 1992, Susie opened a checking account at Wachovia Bank in her name and Richard’s name (“the Wachovia account”), that both her income and Richard’s income were deposited into that account, and that both her expenses and Richard’s expenses were paid with funds from that account.
Richard made the following payments to John Knox Manor for charges incurred by Susie:
March 6, 2008 $ 8,118.10
April 10, 2008 4,588.70
May 9, 2008 1,379.24
May 13, 2008 128.00
June 16, 2008 4,400.00
Aug. 15, 2008 2,100.00
Sept. 30, 2008 6,550.00
Dee. 3, 2008 2,550.00
Dec. 5, 2008 1,000.00
Feb. 25, 2009 1,000.00
March 23, 2009 2,500.00
Aug. 6, 2009 1,052.00
Aug. 6, 2009 7,347.06
Total $42,713.10
After Susie’s admission to the nursing-home unit, Richard applied twice for Medicaid to pay John Knox Manor’s charges; however, the Alabama Medicaid Agency denied both applications on the ground that Richard had failed to submit sufficient information. John Knox Manor then petitioned the probate court to appoint the county guardian and conservator to serve as Susie’s guardian and conservator. The probate court granted John Knox Manor’s petition and appointed the county guardian and conservator to serve as Susie’s guardian and conservator. Thereafter, the county guardian and conservator attempted to obtain information regarding Susie’s finances from Richard in order to satisfy the Alabama Medicaid Agency. The guardian and conservator submitted two applications for Medicaid on Susie’s behalf; however, both of those applications were denied on the ground that necessary information had not been provided. The record indicates that the primary reason all four applications were denied was that Richard was unable to meet a requirement imposed by the Alabama Medicaid Agency that he account for (1) every deposit into the Wa-chovia account that was from a source other than Susie’s Social Security benefits, *115 Kansas Public Employees Retirement System retirement benefits, and United States government retirement benefits and (2) every disbursement from the Wachovia account that was for an expense other than the fees charged by John Knox Manor.
On September 1, 2009, John Knox Man- or and the county guardian and conservator sued Richard. However, when Susie died a short time later, the county guardian and conservator moved the trial court to strike him as a party plaintiff on the ground that Susie’s death had terminated his authority to represent her interests, and the trial court granted that motion.
John Knox Manor stated claims of breach of contract, account stated, conversion, and breach of fiduciary duty against Richard, and it sought a total of $58,857.12 in damages, which represented the unpaid balance of the fees Susie had incurred.
Answering, Richard denied the material allegations of the complaint and denied that he was liable to John Knox Manor. In addition, Richard asserted as an affirmative defense that the contract was void and unenforceable because, he said, it was illegal, unconscionable, lacked consideration, and violated public policy. Subsequently, Richard asserted a counterclaim alleging that John Knox Manor’s employees had indicated to him that his execution of the contract as a “Responsible Party” was a mandatory condition of Susie’s admission to the nursing-home unit and that they had not informed him that federal and state law required John Knox Manor to admit her without Richard’s executing the contract as a “Responsible Party.” Based on those allegations Richard claimed that John Knox Manor was liable for engaging in a deceptive trade practice and that it was liable for an amount equal to the amount he was allegedly obligated to pay John Knox Manor as a “Responsible Party” under the contract.
Thereafter, Richard moved for a partial summary judgment with respect to John Knox Manor’s claims of breach of contract and account stated. As the ground of his motion, Richard asserted that the contract was unenforceable against him because, he said, it violated 42 U.S.C. § 1396r(c)(5)(A)(ii), 42 C.F.R. § 483.12(d)(2), and Alabama Administrative Code (Alabama Medicaid Agency), Rule 560-X-10-.02(9), and that, therefore, it could not constitute the basis of valid claims of breach of contract and account stated. John Knox Manor opposed the motion, and the trial court heard argument regarding the motion on the day of trial. After hearing the parties’ arguments, the trial court took the motion under advisement and proceeded with a bench trial at which it received evidence ore tenus.
Following the trial, the trial court, on December 14, 2010, entered the following judgment:
“This cause comes before the Court following Bench Trial, the same having been considered, it is hereby ORDERED, ADJUDGED AND DECREED that judgment shall be entered for [John Knox Manor] and against [Richard] in the amount of FIFTY-EIGHT THOUSAND, EIGHT HUNDRED FIFTY-SEVEN DOLLARS and TWELVE CENTS ($58,857.12).”
On January 12, 2011, Richard filed a Rule 59, Ala. R. Civ. P., postjudgment motion. In his motion, Richard moved the trial court to amend the judgment to state how it calculated the amount of the damages awarded John Knox Manor and to expressly rule on Richard’s counterclaim. In addition, Richard moved the trial court to vacate its judgment on the grounds (1) that John Knox Manor could not prevail on its claim of breach of contract because, Richard said, the contract was unenforceable because, he said, it violated federal and *116 state law prohibiting John Knox Manor from requiring Richard to sign the contract as a condition of Susie’s admission to the nursing-home unit; (2) that John Knox Manor could not prevail on its claim of account stated because the contract on which it was based was unenforceable; (3) that John Knox Manor could not prevail on its claim of conversion because, Richard said, (i) John Knox Manor lacked standing to prosecute a claim of conversion based on Richard’s alleged conversion of money owned by Susie, (ii) the money that was the subject of John Knox Manor’s conversion claim would not support a conversion claim because it was not specific money capable of identification, and (iii) John Knox Manor had failed to prove that Richard had converted any of Susie’s money; and (4) that John Knox Manor could not prevail on it claim of breach of fiduciary duty because, Richard said, John Knox Manor had failed to prove that Richard owed it a fiduciary duty or that he had breached such a duty.
On January 20, 2011, the trial court denied Richard’s Rule 59 motion, and Richard timely appealed to the supreme court on February 1, 2011. The supreme court then transferred the appeal to this court pursuant to § 12-2-7(6), Ala.Code 1975.
As a threshold matter, we note that the trial court neither expressly ruled on Richard’s counterclaim in its judgment nor certified its judgment as a final judgment pursuant to Rule 54(b), Ala. R. Civ. P, Thus, unless the trial court’s judgment impliedly disposed of Richard’s counterclaim, it is not a final, appealable judgment. See Adams v. NaphCare, Inc., 869 So.2d 1179, 1181 (Ala.Civ.App.2003) (“ ‘An order that does not dispose of all claims or determine the rights and liabilities of all the parties to an action is not a final judgment.’” (quoting Eubanks v. McCollum, 828 So.2d 935, 937 (Ala.Civ.App.2002))). However, we conclude that the trial court’s judgment did impliedly dispose of Richard’s counterclaim. Richard’s counterclaim sought an award of damages offsetting any amount of damages awarded John Knox Manor. Consequently, because the trial court awarded John Knox Manor the full amount of damages it sought and did not offset any portion of that award with an award of damages to Richard, the trial court’s judgment necessarily denied Richard’s counterclaim. See Dutton v. Chester F. Raines Agency, Inc., 475 So.2d 545, 547 (Ala.1985) (“While the trial court may not have specifically addressed Count Four [of the defendant’s counterclaim], the court necessarily rejected that claim by rendering a judgment in favor of [the plaintiff].”). Therefore, the trial court’s judgment is a final, appealable judgment.

Standard of Review

Because the trial court received evidence ore tenus, our review is governed by the following principles:
“1 “ ‘[W]hen a trial court hears ore tenus testimony, its findings on disputed facts are presumed correct and its judgment based on those findings will not be reversed unless the judgment is palpably erroneous or manifestly unjust.’ ” ’ Water Works & Sanitary Sewer Bd. v. Parks, 977 So.2d 440, 443 (Ala.2007) (quoting Fadalla v. Fadalla, 929 So.2d 429, 433 (Ala.2005), quoting in turn Philpot v. State, 843 So.2d 122, 125 (Ala.2002)). ‘ “The presumption of correctness, however, is rebuttable and may be overcome where there is insufficient evidence presented to the trial court to sustain its judgment.” ’ Wattman v. Rowell, 913 So.2d 1083, 1086 (Ala.2005) (quoting Dennis v. Dobbs, 474 So.2d 77, 79 (Ala.1985)). ‘Additionally, the ore tenus rule does not extend to cloak with *117 a presumption of correctness a trial judge’s conclusions of law or the incorrect application of law to the facts.’ Wattman v. Rowell, 918 So.2d at 1086.”
Retail Developers of Alabama, LLC v. East Gadsden Golf Club, Inc., 985 So.2d 924, 929 (Ala.2007).

Analysis

Richard first argues that the trial court erred insofar as it may have based its judgment in favor of John Knox Manor on John Knox Manor’s breach-of-contract and account-stated claims because, Richard says, they were based on a contract that was unenforceable by virtue of 42 U.S.C. § 1396r(c)(5)(A)(ii), 42 C.F.R. § 488.12(d)(2), and Alabama Administrative Code (Alabama Medicaid Agency), Rule 560-X-10-.02(9).
42 U.S.C. § 1396r(c)(5), which applies to nursing homes that participate in the Medicaid program, provides, in pertinent part:
“(A) Admission
“With respect to admission practices, a nursing facility must—
[[Image here]]
“(ii) not require a third-party guarantee of payment to the facility as a condition of admission (or expedited admission) to, or continued stay in, the facility....
[[Image here]]
“(B) Construction
[[Image here]]
“(ii) Contracts with legal representatives
“Subparagraph (A)(ii) shall not be construed as preventing a facility from requiring an individual, who has legal access to a resident’s income or resources available to pay for care in the facility, to sign a contract (without incurring personal financial liability ) to provide payment from the resident’s income or resources for such care.”
(Emphasis added.)
42 C.F.R. § 483.12(d)(2), a regulation promulgated by the United States Department of Health and Human Services that applies to nursing homes that participate in the Medicaid program, provides:
“(2) The facility must not require a third party guarantee of payment to the facility as a condition of admission or expedited admission, or continued stay in the facility. However, the facility may require an individual who has legal access to a resident’s income or resources available to pay for facility care to sign a contract, without incurring personal financial liability, to provide facility payment from the resident’s income or resources.”
(Emphasis added.)
Alabama Administrative Code (Alabama Medicaid Agency), Rule 560-X-10-.02(9), provides:
“Nursing facilities must not require a third party guarantee of payment to the facility as a condition of admission, or expedited admission, or continued stay in the facility. Nursing facilities may require an individual who has legal access to a resident’s income or resources available to pay for nursing facility care, to sign a contract, without incurring personal financial liability, to provide facility payment from the resident’s income or resources.”
(Emphasis added.)
In the case now before us, it is undisputed that John Knox Manor was operating a nursing home and was participating in the Medicaid program and that, therefore, it was subject to 42 U.S.C. § 1396r(c)(5)(A)(ii), 42 C.F.R. § 483.12(d)(2), ánd Alabama Administrative Code (Alabama Medicaid Agency), *118 Rule 560-X-10-.02(9), when Richard signed the contract as a “Responsible Party.” The contract provided that the “Resident or Responsible Party” would pay Susie’s charges. John Knox Manor argues that the contract did not run afoul of 42 U.S.C. § 1396r(e)(5)(A)(ii), 42 C.F.R. § 483.12(d)(2), and Rule 560-X-10-.02(9) because, it says, Richard’s liability was limited to paying Susie’s charges using Susie’s income and assets. In support of this argument, John Knox Manor cites testimony of Sherry Roundtree, the executive administrator of John Knox Manor, and a written document titled “Admission Policy” that was apparently given to Richard when he signed the contract. Although Roundtree testified that the contract obligated Richard only to use Susie’s income and assets to pay Susie’s charges, she admitted on cross-examination that the contract did not contain such a limitation:
“Q. So under this [contract], it is your contention Mr. Knight agreed to be responsible for the full room and board rate to the nursing home; is that correct?
“A. He agreed to see that her charges were paid.
“Q. It has got his name on here. In other words, you are saying—
“A. For his mother.
“Q. —as responsible party, you are alleging he has agreed to pay the full room and board rate, plus the supplies and other items?
“A. His mother was not competent to do that. As a representative for her, he agreed to see those things were paid.
“Q. That’s right, as a third-party for her then, you are requiring him to pay these items?
“A. No, to use her money to pay for it.
“Q. That’s not what this says.

“A. Well, it may not say it, but that’s what it means.

“Q. Let’s talk about what the [contract] says.
“A. Okay.
“Q. This [contract] basically is requiring, per your allegations, that Richard Knight be responsible for the entire nursing home bill; is that correct?
“A. That’s correct.
“Q. It does not say that Richard Knight is required to pay over any income or resources of his mother, does it?

“A. No, it doesn’t.”

(Emphasis added.)
Moreover, although the document titled “Admission Policy” states that “[t]he Responsible Party is a person who agrees to assist the facility in providing for the health care of the resident and to provide the facility payment from the resident’s income or resources for services provided ” (emphasis added), that document was not a part of the contract.
“The general rule of contract law provides that if a written contract exists, the rights of the parties are controlled by that contract and parol evidence is not admissible to contradict, vary, add to, or subtract from its terms. Clark v. Albertville Nursing Home, Inc., 545 So.2d 9, 11 (Ala.1989). However, if the contract is ambiguous, parol or extrinsic evidence will be allowed to clarify the contract. Cummings v. Hill, 518 So.2d 1246, 1247 (Ala.1987).”
Marriott Int’l, Inc. v. deCelle, 722 So.2d 760, 762 (Ala.1998). John Knox Manor did not contend before the trial court and does not contend before this court that the contract is ambiguous regarding Richard’s obligations, and we find no ambiguity. The plain language of the contract indicates that Richard is obligated to pay Susie’s charges, and it contains no language limit *119 ing his obligation to providing John Knox Manor with payment for those charges from Susie’s income and assets. Accordingly, we find no merit in John Knox Man- or’s argument that the contract limited Richard’s liability to paying John Knox Manor using Susie’s income and assets.
In Slovik v. Prime Healthcare Corp., 838 So.2d 1054, 1057 (Ala.Civ.App.2002), this court held that a nursing home’s claim alleging that a third party “had agreed to be personally responsible each month for forwarding a portion of [a nursing-home patient’s] Social Security income, over which [the third party] had control, to [the nursing home] to pay for part of the cost of the [patient’s] nursing-home care” and that “[the third party] was liable for damages resulting from his failure” to “forward the agreed-upon funds to the [nursing home]” was “premised upon an alleged agreement by [the third party] as a primary obligor, rather than as a guarantor of [the patient’s] performance.” This court implied that such an agreement would not violate Rule § 560-X-10-.02(9). See 838 So.2d at 1057 n. 2. However, the issue whether that alleged agreement violated 42 U.S.C. § 1396r(c)(5)(A)(ii), 42 C.F.R. § 483.12(d)(2), and Rule 560-X-10-.02(9) was not squarely before us in Slovik
The language in 42 U.S.C. § 1396r(c)(5)(A), 42 C.F.R. § 483.12(d)(2), and Rule 560-X-10-.02(9), stating that a nursing home must not require a third-party guarantee of payment to a facility as a condition of a patient’s admission might suggest that they prohibit a nursing home only from requiring a third party to guarantee the patient’s payment as a condition of the patient’s admission and that they do not prohibit a nursing home from requiring a third party to agree to be personally liable for the patient’s debts as a primary obligor. However, the language in 42 U.S.C. § 1396r(c)(5)(B)(ii), 42 C.F.R. § 483.12(d)(2), and Rule 560-X-10-.02(9), allowing a nursing home to “require an individual who has legal access to a resident’s income or resources available to pay for nursing facility care, to sign a contract, without incurring personal financial liability, to provide facility payment from the resident’s income or resources” (emphasis added), indicates that Congress intended to prohibit a nursing home from requiring a third party to incur personal liability for a patient’s charges as a condition of the patient’s admission regardless of whether such a requirement was imposed in the form of a guarantee of the patient’s performance or in the form of a primary obligation. Accordingly, we conclude that, because John Knox Manor required Richard to sign the contract as a condition of Susie’s admission to the nursing-home unit, the language of the contract, which requires Richard to pay Susie’s charges as a primary obligor, violates 42 U.S.C. § 1396r(c)(5)(A)(ii) and (B)(ii), 42 C.F.R. § 483.12(d)(2), and Rule 560-X-10-.02(9).
The parties have not cited any Alabama case addressing the issue whether contractual language that violates 42 U.S.C. § 1396r(c)(5)(A)(ii) and (B)(ii), 42 C.F.R. § 483.12(d)(2), and Rule 560-X-10-.02(9) is thereby rendered unenforceable, and we have not found such an Alabama case. However, in Manor of Lake City, Inc. v. Hinners, 548 N.W.2d 573 (Iowa 1996), the Iowa Supreme Court held that contractual language that violates 42 U.S.C. § 1396r(c)(5)(A)(ii) by imposing personal liability on a third party for payment of the patient’s charges as a condition of the patient’s admission is unenforceable.
In Manor of Lake City, Dean Hinners (“Dean”), who was a son of Edna Hinners (“Edna”), signed an agreement for the admission of Edna to a nursing home owned and operated by Manor of Lake City, Inc. (“Manor”), as “Responsible Party.” In *120 pertinent part, the admission agreement provided that “ ‘[t]he Responsible Party agrees to be bound in his or her individual capacity by all of the terms and conditions of the Agreement pertaining to the Resident.’ ” 548 N.W.2d at 575 n. 1. Dean personally paid Edna’s charges for approximately one year but then stopped. Thereafter, Manor sued Dean. Among the claims stated by Manor was a breach-of-contract claim in which Manor sought a judgment against Dean personally for the unpaid charges. The jury returned a verdict against Dean on that claim, as well as others, and a judgment was entered on the jury’s verdict. Appealing to the Iowa Supreme Court, Dean argued “that, as to him, the nursing home’s contract claim should have been barred as a matter of law because the contract required a third-party guarantee in violation of federal law.” 548 N.W.2d at 575. The Iowa Supreme Court agreed with Dean, stating:
“It was of course entirely permissible under § 1396r(e)(5)(B)(ii) for Manor to require an individual who has legal access to a resident’s income to tender payment from that resident’s income for the care rendered. This is exactly what the nursing care contract’s responsible-party clause properly contemplates. Manor’s form agreement however goes further when it causes the signing party to become personally liable. This extension clearly violates federal law if it was a condition of admission.”
548 N.W.2d at 576.
Although the objectionable contract language at issue in Manor of Lake City differs from the objectionable language of the contract at issue in the case now before us, the objectionable language in both contracts is objectionable for the same reason — it purports to impose personal liability on a third party for a patient’s charges.
We conclude that, because it is undisputed that John Knox Manor required Richard to sign the contract as a condition of Susie’s admission to the nursing-home unit and because the plain language of the contract purported to impose personal liability on Richard for the payment of Susie’s charges, the contract language purporting to impose personal liability on Richard for the payment of Susie’s charges violated 42 U.S.C. § 1396r (c) (5) (A) (ii), 42 C.F.R. § 483.12(d)(2), and Rule 560-X-10~.02(9). We further conclude that, because the language of the contract purporting to impose personal liability on Richard for payment of Susie’s charges violates 42 U.S.C. § 1396r(c)(5)(A)(ii), 42 C.F.R. § 483.12(d)(2), and Rule 560-X-10-.02(9), that language was unenforceable. Because that language was unenforceable, the trial court erred insofar as it may have based its judgment in favor of John Knox Manor on John Knox Manor’s breach-of contract claim. Moreover, because the basis for John Knox Manor’s account-stated claim was the personal liability for Susie’s charges that the contract purported to impose on Richard and the contractual language purporting to impose that personal liability on Richard is unenforceable, the trial court erred insofar as it may have based its judgment in favor of John Knox Manor on John Knox Manor’s account-stated claim.
Richard also argues that the trial court erred insofar as it may have based its judgment in favor of John Knox Manor on John Knox Manor’s conversion claim on the ground, among others, that John Knox Manor failed to meet its burden of proving the essential elements of conversion, which include “ ‘a wrongful taking, an illegal assumption of ownership, an illegal use or misuse of another’s property, or a wrongful detention or interference with another’s property.’ ” SouthTrust Bank v. Donely, *121 925 So.2d 934, 939 (Ala.2005) (quoting Riscorp, Inc. v. Norman, 915 So.2d 1142, 1152 (Ala.2005) (emphasis omitted)).
For purposes of our analysis, we will assume, without deciding, that John Knox Manor was subrogated to any conversion claim Susie may have had against Richard. The undisputed evidence established that Richard paid John Knox Manor a total of $42,713.10 for Susie’s care. John Knox Manor did not prove the amount of proceeds Richard received as a result of the sale of 450 shares of Susie’s Wachovia Corporation stock or the value of the three shares of stock in Navistar International Corporation that were apparently never sold. Consequently, the total value of Susie’s property that John Knox Manor could prove passed through Richard’s hands totaled $40,671.22, which was less than the total amount he paid John Knox Manor for Susie’s care. Because using Susie’s property to pay John Knox Manor for her care was a proper use of Susie’s property and John Knox Manor failed to prove that Richard received property belonging to Susie with a value in excess of the $42,713.10 he paid John Knox Manor for her care, John Knox Manor failed to prove that Richard had converted any of Susie’s property. Accordingly, the trial court erred insofar as it may have based its judgment in favor of John Knox Manor on John Knox Manor’s conversion claim.
Finally, Richard argues that the trial court erred insofar as it may have based its judgment in favor of John Knox Manor on John Knox Manor’s breach-of-fiduciary-duty claim on the ground, among others, that John Knox Manor failed to prove that he had breached any fiduciary duty he owed John Knox Manor. For purposes of our analysis, we will assume, without deciding, that Richard owed John Knox Man- or a fiduciary duty. Because, as discussed above, John Knox Manor was prohibited from imposing personal liability for Susie’s charges on Richard, any fiduciary duty Richard would have owed John Knox Man- or would have been limited to using Susie’s property to pay John Knox Manor for her care. As demonstrated above, John Knox Manor failed to prove that Richard received property belonging to Susie with a value greater than the $42,713.10 he paid John Knox Manor for her care. Therefore, John Knox Manor failed to prove that Richard had breached any fiduciary duty he may have owed John Knox Manor. Consequently, the trial court erred insofar as it may have based its judgment in favor of John Knox Manor on John Knox Man- or’s breach-of-fiduciary-duty claim.
Accordingly, we reverse the judgment of the trial court and remand the cause for further proceedings consistent with this opinion.
REVERSED AND REMANDED.
THOMPSON, P.J., and PITTMAN, THOMAS, and MOORE, JJ., concur.

. The record indicates that Susie’s total income for 2008 was $16,794.96, that her total income for the first seven months of 2009 was $10,172.26, and that her total income for August, September, and October 2009 was $4,359.54. Those amounts total $31,326.76.