The RIVERBEND ASSOCIATION, INC.

v.

RIVERBEND, LLC, and River Bend Marina, LLC.

2130579.

Court of Civil Appeals of Alabama.

July 24, 2015.

Certiorari Denied April 15, 2016
Alabama Supreme Court 1141191.

James M. Gaines and Nancy S. Gaines of Gaines & Gaines, L.L.C., Magnolia Springs, for appellant.

Jeffrey McLaughlin and Lea Mosley Hicks of McLaughlin & Edmondson, LLC, Guntersville, for appellees.

*On Application for Rehearing*

THOMAS, Judge.

The opinion of April 10, 2015, is withdrawn, and the following is substituted therefor.

In 1974, Anne Homes, Inc., constructed a condominium development. As part of its development of the project, Anne Homes constructed a sewage-treatment plant on land adjacent to the condominium development. The sewage-treatment plant was intended to serve the condominium development.

In November 1974, Anne Homes entered into what was entitled a lease ("the 1974 agreement") with The Riverbend Association, Inc. ("RAI"), an association composed of the owners of the units in the condominium development, and Riverbend Marina Company, Inc. ("the marina"). The 1974 agreement was for a five-year term, with nine automatic-renewal terms of five years each; however, RAI and the marina could elect not to renew the 1974 agreement. The 1974 agreement granted possession of the sewage-treatment plant to RAI and the marina. RAI and the marina were required to perform all maintenance on the sewage-treatment plant. RAI and the marina were each responsible

for one-half of the monthly rental payment under the 1974 agreement, and, initially, they were to divide the expenses of the operation of the sewage-treatment plant on a percentage basis, with the marina being responsible for 10% of the expenses of operating the sewage-treatment plant and RAI being responsible for the remaining 90%.

In 1981, Anne Homes defaulted on the mortgage secured by the property upon which the sewage-treatment plant was located. The Peoples National Bank of Huntsville ("the bank") foreclosed on the mortgage and purchased the property at the foreclosure sale. When the bank took possession of the property, the sewage-treatment plant was in need of significant repairs, which the bank made. After the foreclosure, the marina was no longer an extant entity, and the bank and RAI entered into what was labeled as an amendment to the 1974 agreement ("the 1981 amendment"). The 1981 amendment, however, specified that the 1974 agreement had not actually been a lease but had instead been a license agreement permitting RAI and the marina to use the sewage-treatment plant.[1] The 1981 amendment clarified that the bank and RAI were entering into a license agreement, and it deleted or modified certain provisions of the 1974 agreement, including deleting the provision requiring rent payments and replacing the provision governing the division of the expenses of operating the sewage-treatment plant. The 1981 amendment required that the bank pay 10% of the expenses of operating the sewage-treatment plant and that RAI pay 90%. The provision governing the division of the expenses further stated:

"If, at any time in the future additional sewer line taps are made into the [sewage-treatment plant], the parties agree that thereafter all expenses of the operation of the [sewage-treatment plant] shall be apportioned on a pro rata basis among the users based on the number of units using the treatment facility system. The Bank, its successors and assigns, shall remain in full control and possession of the [sewage-treatment plant] at all times and shall have the right, at any time, and from time to time, to allow additional sewage taps into the [sewage-treatment plant], provided, however, that in no event shall the Bank, its successors or assigns, allow any taps which would result in exceeding the [sewage-treatment plant's] capacity."

Also in 1981, the bank sold the sewage-treatment plant to River Bend, Ltd. The deed from the bank to River Bend, Ltd., specifically references the 1974 agreement and the 1981 amendment. In addition, the bank and River Bend, Ltd., executed a document entitled "Assignment of Interests and Assumptions of Obligations Agreement" ("the assignment agreement"). Under the assignment agreement, among other things, River Bend, Ltd., assumed the obligations of the bank under the 1974 agreement and the 1981 amendment. River Bend, Ltd., operated the sewage-treatment plant from mid–1981 to October 2010. During that time, River Bend, Ltd., billed RAI for, and RAI paid, 90% of the expenses associated with the operation of the sewage-treatment plant.

In October 2010, River Bend, Ltd., conveyed the sewage-treatment plant to Riv-

---

1. That specific provision in the 1981 amendment reads:

"Notwithstanding the characterization of the instrument as a 'lease,' Anne Homes, Inc.[,] continued in possession and operation of the [sewage-treatment plant] and the lessees under the Lease were in fact only licensees granted the license to use the [sewage-treatment plant] for the consideration stated in the Lease."

erbend, LLC. The deed from River Bend, Ltd., to Riverbend, LLC, did not contain any reference to the 1974 agreement, the 1981 amendment, or the assignment agreement. Riverbend, LLC, or River Bend Marina, LLC (hereinafter referred to collectively as "Riverbend"),[2] continued the billing practices instituted by River Bend, Ltd., and billed RAI for 90% of the expenses associated with the operation of the sewage-treatment plant. In 2011, however, RAI determined that, because additional sewer taps had been added, RAI was no longer responsible for 90% of the expenses associated with the operation of the sewage-treatment plant. Based on the increased number of users, RAI calculated its pro rata share of the expenses associated with the operation of the sewage-treatment plant to be approximately 72%, and RAI began paying Riverbend that reduced amount in June 2011. Riverbend objected to RAI's unilateral reduction of the payments, and Riverbend threatened to terminate sewer service to the condominium development.

In March 2012, RAI sued Riverbend and fictitiously named parties, seeking a judgment declaring that Riverbend was bound by the terms and conditions of the 1974 agreement and the 1981 amendment. RAI also sought an accounting, an injunction to prevent Riverbend from terminating sewer service to the condominium development, and damages for breach of contract, which damages it claimed had resulted from Riverbend's billing RAI more than the amount required by the 1981 amendment.[3] Riverbend filed an answer, which it later amended to add counterclaims seeking a judgment declaring that Riverbend was not bound by the terms of the 1974 agreement and the 1981 amendment, that Riverbend was entitled to change the billing plan for its services to a per-user billing plan based on consumption, and that Riverbend was entitled to include in its billing a profit margin. Riverbend also sought damages for breach of contract or unjust enrichment based on RAI's failure to pay in full the amount Riverbend had billed RAI.

RAI moved for a partial summary judgment. In its motion, RAI requested that the trial court determine that it had an irrevocable license to use the sewage-treatment plant and that Riverbend was bound by the terms of the 1974 agreement and the 1981 amendment. Riverbend opposed RAI's motion and filed a cross-motion for a summary judgment, in which it argued that it was not bound by either the 1974 agreement or the 1981 amendment and that Riverbend was entitled to charge RAI reasonable fees for the sewer service Riverbend provided. Riverbend specifically sought a judgment in its favor determining that Riverbend had acquired title to the sewage-treatment plant free from the obligations imposed by the 1974 agreement and the 1981 amendment, that Riverbend could include a profit margin in its billing for sewer services, that Riverbend could

**2.** The complaint names as parties Riverbend, LLC, and River Bend Marina, LLC. The record indicates that there may be some relationship between the two entities. In their original answer, Riverbend, LLC, and River Bend Marina, LLC, stated that River Bend Marina, LLC, managed the operation of the sewage-treatment plant. Other documentation in the record supports this conclusion. However, in their amended answer, Riverbend, LLC, and River Bend Marina, LLC, stated that Riverbend, LLC, managed the operation of the sewage-treatment plant. Because the parties treated the entities as if they were one entity, we will do the same and will generally collectively refer to the two entities as "Riverbend."

**3.** Soon after the institution of the action, Riverbend agreed not to terminate sewer service to the condominium development during the pendency of the litigation. Thus, RAI's request for an injunction became moot.

change its billing practice to bill users individually, and that RAI owed Riverbend the remaining balance between the amount RAI paid and the amount it had been billed for the sewer services provided between June 2011 and the date of the judgment.

The trial court entered a summary-judgment order deciding the issues in favor of Riverbend on November 13, 2013. In its November 2013 order, the trial court did not determine the character of the 1974 agreement or the 1981 amendment. The trial court further determined that Riverbend was not bound by the 1974 agreement or the 1981 amendment, but, the trial court concluded, if Riverbend were bound by those agreements, the agreements had not been breached. The trial court further concluded that neither the 1974 agreement nor the 1981 amendment prohibited Riverbend from charging reasonable rates for sewer service, from including within its charges an amount sufficient to create a reasonable profit, or from changing its billing system to a per-user, metered billing system. Based on its conclusions, the trial court ordered that RAI pay $24,404.41 in past-due sewer-service charges and permitted Riverbend to submit a supplemental affidavit of additional past-due sewer-service charges within 30 days.[4]

Riverbend submitted a supplemental affidavit indicating that RAI owed an additional $4,873.63 in past-due sewer-service charges. RAI filed a "postjudgment" motion on December 13, 2013. The trial court amended its judgment on January 21, 2014, to require RAI to pay the additional past-due sewer-service charges. RAI's premature postjudgment motion quickened when the judgment was made final by the trial court's entry of the January 21, 2014, order amending its judgment to include the additional amount owed by RAI. *See New Addition Club, Inc. v. Vaughn*, 903 So.2d 68, 72 (Ala.2004) ("We hold that if a party moves for a judgment as a matter of law or, in the alternative, for a new trial before the court has entered judgment, the motion shall be treated as having been filed after the entry of the judgment and on the day thereof."); *see also Richardson v. Integrity Bible Church, Inc.*, 897 So.2d 345, 347 (Ala.Civ. App.2004) (explaining that "a premature postjudgment motion that, if it had been directed to a final judgment, would toll the time for filing a notice of appeal from a final judgment ... 'quickens' on the day that the final judgment is entered"). The motion was then denied by operation of law on April 21, 2014. RAI timely filed its notice of appeal to this court on April 16, 2014. Pursuant to Rule 4(a)(5), Ala. R.App. P., we held RAI's appeal in abeyance until the denial of RAI's postjudgment motion by operation of law.

We review a summary judgment de novo; we apply the same standard as was applied in the trial court. A motion for a summary judgment is to be granted when no genuine issue of material fact exists and the moving party is entitled to a judgment as a matter of law. Rule 56(c)(3), Ala. R.

---

4. By determining that Riverbend was bound by neither the 1974 agreement nor the 1981 amendment, that Riverbend could change its billing practices, and that RAI owed Riverbend past-due sewer-service charges, the trial court necessarily rejected RAI's claims, and all issues pending before the trial court were resolved. *See Dutton v. Chester F. Raines Agency, Inc.*, 475 So.2d 545, 547 (Ala.1985) ("While the trial court may not have specifically addressed Count Four [of the defendant's counterclaim], the court necessarily rejected that claim by rendering a judgment in favor of [the plaintiff]."); *Knight v. John Knox Manor, Inc.*, 92 So.3d 111, 116 (Ala.Civ.App. 2012) (relying on *Dutton* to conclude that a judgment awarding damages to one party and not awarding the set off requested by the other party was an implicit denial of the counterclaim for a set off).

Civ. P. A party moving for a summary judgment must make a prima facie showing "that there is no genuine issue as to any material fact and that [it] is entitled to a judgment as a matter of law." Rule 56(c)(3); *see Lee v. City of Gadsden*, 592 So.2d 1036, 1038 (Ala.1992). If the movant meets this burden, "the burden then shifts to the nonmovant to rebut the movant's prima facie showing by 'substantial evidence.' " *Lee*, 592 So.2d at 1038. "[S]ubstantial evidence is evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved." *West v. Founders Life Assurance Co. of Florida*, 547 So.2d 870, 871 (Ala.1989); *see* Ala.Code 1975, § 12–21–12(d). The material facts of this case are undisputed.

On appeal, RAI argues that it has an irrevocable license to use the sewage-treatment plant and that, because Riverbend had notice of that license, the license is enforceable against Riverbend.[5] Riverbend appears to concede that the 1981 amendment created a license in favor of RAI. However, Riverbend contends that the license is not enforceable against Riverbend because neither the 1974 agreement nor the 1981 amendment were referenced in the deed conveying the sewage-treatment plant to Riverbend.

■ We agree with RAI that the right created by the 1981 amendment was a license in RAI to use the sewage-treatment plant. " 'A license is an authority to do some act or series of acts on the land of another, for the benefit of the licensee, without passing any estate in the land.' " *Holt v. City of Montgomery*, 212 Ala. 235, 237, 102 So. 49, 50 (1924) (quoting *Stinson v. Hardy*, 27 Or. 584, 589, 41 P. 116, 118 (1895)). The language of the 1981 amendment was clearly designed to clarify the nature of RAI's interest, and, as noted above, the 1981 amendment states that the bank would retain possession of and the right to use the property upon which the sewage-treatment plant sits and that RAI would have merely the right to enter the sewage-treatment plant for purposes of inspection and repair.

■ The determination that RAI possesses a license to use the sewage-treatment plant does not end our inquiry. We must determine whether Riverbend is bound by the license, which, the parties argue, depends on whether the license became irrevocable. Typically, because a license creates a personal right, the licensor may revoke a license at will. *Camp v. Milam*, 291 Ala. 12, 17, 277 So.2d 95, 99 (1973). However, the rule that licenses are revocable at will is not without its exception, which our supreme court set out in *Camp*:

"To prevent possible injustice the law began to recognize that the giving of one's permission to another for the doing of certain acts with respect to the property of the former did not necessarily carry with it the unlimited right to withdraw the consent. The concept was

---

5. In its brief on appeal, RAI also asserts that the actual right created by the 1981 amendment was an easement. RAI did not argue that the 1974 agreement or the 1981 amendment created an easement in its motion for a partial summary judgment. This court cannot consider an argument not asserted before the trial court. *Ex parte Ryals*, 773 So.2d 1011, 1013 (Ala.2000) (explaining that an "appellate court can consider an argument *against* the validity of a summary judgment only to the extent that the record on appeal contains material from the trial court record presenting that argument to the trial court before or at the time of submission of the motion for summary judgment"). Accordingly, we will not address RAI's contention that it has an easement in the sewage-treatment plant.

broadened to look upon the license not merely as the giving of consent, but, in certain instances, the conferring of a legal right—a license coupled with an interest.[1] From this broadened concept of a license came the ingrafting of the recognized exception to the general rule which may be stated thusly:

" 'A license has been generally defined as a mere personal privilege ... revocable at the will of the ... (licensor) unless ... in the meantime expenditures contemplated by the licensor when the license was given have been made ...' [2]

"Thus, when expenditures contemplated by the licensor have been made by the licensee, the license, having been acted upon so as to greatly benefit the licensor, is said to have been executed. An executed license, for reasons founded upon the equitable principle of estoppel, becomes irrevocable and confers upon the licensee a substantive equitable right in the property.[3]

---

" [1] See Clark, *Covenants and Interest Running with Land,* (1947 ed.), pp. 13–64.

" [2] *City of Owensboro v. Cumberland Telephone & Telegraph Co.,* 230 U.S. 58, 64, 33 S.Ct. 988, 990, 57 L.Ed. 1389, 1393 [(1913)].

" [3] Megarry and Baker, *Snell's Principles of Equity,* (1966 ed.), pp. 629–633."

*Camp,* 291 Ala. at 17–18, 277 So.2d at 99.

RAI contends that its license is irrevocable because it expended substantial sums of money to fund the operation of the sewage-treatment plant, as required under both the 1974 agreement and the 1981 amendment. Indeed, our court has considered payments due under an agreement creating a license when determining whether a license has become irrevocable. *See Blackburn v. Lefebvre,* 976 So.2d 482, 493 (Ala.Civ.App.2007) (indicating that, among other things, the licensor had bene-

fited from the receipt of a payment due under the agreement creating a license for the use of a boat slip). The 1974 agreement required RAI to assume 90% of the operating expenses of the sewage-treatment plant. RAI continued to pay that percentage of the operating expenses of the sewage-treatment plant even under the 1981 amendment. Thus, at the time the trial court considered the summary-judgment motions, RAI had funded the majority of the operational expenses of the sewage-treatment plant for nearly 40 years. RAI's members, the owners of the condominiums serviced by the sewage-treatment plant, had relied on the service provided by that plant for the same length of time.

Riverbend argues that the expenditures made by RAI were not significant enough to warrant a conclusion that the license was made irrevocable. Neither RAI's payment of money for sewer services nor RAI's payment of rent under the 1974 agreement, Riverbend contends, were expenditures that greatly benefited Riverbend or its predecessors. The expenditures in *Camp* and *Blackburn,* which involved, respectively, the construction of an earthen dam and the purchase of a parcel of real property, were large expenditures anticipated by the licensor, made in reliance on the respective license, and made in order to enjoy the license. *Camp,* 291 Ala. at 18, 277 So.2d at 100; *Blackburn,* 976 So.2d at 493. The payment of rent under the 1974 agreement and any payments for sewer services provided under the 1974 agreement and the 1981 amendment were contractually required and were not undertaken by RAI in reliance on the license or in order to enjoy the license. Thus, we agree with Riverbend that the license has not been rendered irrevocable.

■ However, we do not agree with the trial court and Riverbend that Riverbend

is not bound by the 1974 agreement and the 1981 amendment. " 'Where a license constitutes, in effect, a contract, the rights and obligations of the parties under such license agreement depend on the provisions thereof.' " *Earth Prods. Co. v. Oklahoma City*, 441 P.2d 399, 402 (Okla.1968) (quoting 53 C.J.S. *Licenses* § 84). The 1974 agreement and the 1981 amendment that created the license at issue in this case are like any other contracts, and we will apply the usual principles governing the construction of contracts to determine whether the license is binding on Riverbend. *See David Lee Boykin Family Trust v. Boykin*, 661 So.2d 245, 251 (Ala. Civ.App.1995) ("The substantive rules governing licenses are the same as those governing contracts.").

> "In interpreting a contract, the ' "words of the agreement will be given their ordinary meaning." ' *Hibbett Sporting Goods, Inc. v. Biernbaum*, 391 So.2d 1027, 1029 (Ala.1980) (quoting *Flowers v. Flowers*, 334 So.2d 856, 857 (Ala. 1976)).... 'If the terms within a contract are plain and unambiguous, the construction of the contract and its legal effect become questions of law for the court....' *McDonald v. U.S. Die Casting & Development Co.*, 585 So.2d 853, 855 (Ala.1991) (citations omitted)."

*Reeves Cedarhurst Dev. Corp. v. First Amfed Corp.*, 607 So.2d 184, 186 (Ala. 1992).

The language used in the 1981 amendment indicates that the license was expressly made binding on the bank's successors and assigns. *See Plastone Plastic Co. v. Whitman–Webb Realty Co.*, 278 Ala. 95, 97, 176 So.2d 27, 28–29 (1965) (stating that a contract providing that it " 'shall be binding on the successors, heirs, assigns, executors or administrators' " of the parties was binding upon the "respective successors or assigns" of those parties); and Jon W. Bruce & James N. Ely, Jr., *The Law of Easements & Licenses in Land* § 11:4 (West 2011) (indicating that, despite the general rule that a license is not assignable, a license agreement may provide that a license be assignable). The provision governing the apportionment of the expenses of operating the sewage-treatment facility specifically stated:

> "The Bank, its successors and assigns, shall remain in full control and possession of the [sewage-treatment plant] at all times and shall have the right, at any time, and from time to time, to allow additional sewage taps into the [sewage-treatment plant], provided, however, that in no event shall the Bank, its successors or assigns, allow any taps which would result in exceeding the [sewage-treatment plant's] capacity."

Furthermore, although RAI was permitted to terminate the license at the conclusion of each five-year period, the licensor was not given that option; the 1974 agreement permitted termination of the license by the licensor only upon an action amounting to default, like failing to pay rent or violating other terms of the 1974 agreement. *See Lake Martin/Alabama Power Licensee Ass'n v. Alabama Power Co.*, 547 So.2d 404, 409 (Ala.1989) (determining that licenses at issue were not irrevocable and noting that the parties were granted equal rights to terminate the agreements on 90 days notice and that the licenses were for a specific term); *see also Coumas v. Transcontinental Garage, Inc.*, 68 Wyo. 99, 127, 230 P.2d 748, 758 (1951) ("A more universal rule is, we think, that a privilege to do certain acts of a temporary character on the land of another is and always remains a mere license which is revocable at the will of a licensor unless a definite time has been specified...."); and *Bryant v. Marstelle*, 76 Cal.App.2d 740, 746, 173 P.2d 846, 850 (1946) (stating that a licensor could revoke a license at any time after the

expiration of the specified period of the license). Thus, we cannot conclude that Riverbend is not bound by the provisions of the 1974 agreement and the 1981 amendment, which specifically provide that successors of the bank are so bound and which supersede by their terms the general principle that licenses are terminable at the will of the licensor.

■ Thus, we conclude that trial court erred in determining that Riverbend was not bound by the 1974 agreement and the 1981 amendment. The trial court further concluded in its judgment that, even if Riverbend were bound by the 1974 agreement and the 1981 amendment, no breach had occurred and nothing in the language of either document prevented Riverbend from changing the way it billed for its services or from charging enough for its services to make a profit. In making those determinations, the trial court further erred.

The license in favor of RAI requires that it be allowed to use the sewage-treatment plant and that it pay a pro rata share of the expenses for the operation of the sewage-treatment plant. Thus, Riverbend is not free to change the way it bills RAI or RAI's members for sewer service during the term of the license. As RAI contends on appeal, the provisions in the 1974 agreement and the 1981 amendment governing the payment of the expenses of operating the sewage-treatment plant do not appear to allow for a for-profit operation of the sewage-treatment plant. The 1981 amendment specifically provides that "[t]he expenses of operation shall include, but not be limited to the following: service for electricity, water; necessary chemicals; maintenance; upkeep; monthly or periodic inspection fees charged by a registered engineer to examine the [sewage-treatment plant] and to make reports of findings to the appli-

cable authorities; repair and replacement of all the equipment in the sewage treatment [plant] including all pipes into and out of said [plant] including all outfall lines; and all other expenses for any other repairs or replacements necessary for the continuing operation of the [sewage-treatment plant]."

Those expenses were, according to the terms of the 1981 amendment, originally to be divided between the owner of the sewage-treatment plant and RAI, with RAI being responsible for the payment of 90% of those expenses.

The trial court indicated that "the categories of expenses enumerated in the [1981 amendment] are sufficiently broad enough to encompass a profit margin as well as costs designed to provide for the 'repair' and 'replacements necessary for the continuing operation of the plant.'" However, as RAI points out, the term "profit" is defined as "the excess of returns over expenditure in a transaction or series of transactions," *Merriam–Webster's Collegiate Dictionary* 992 (11th ed.2003), or "[t]he excess of revenues over expenditures in a business transaction." *Black's Law Dictionary* 1404 (10th ed.2014). "Expense" is defined as "financial burden or outlay: cost," *Merriam–Webster's Collegiate Dictionary* 440 (11th ed.2003), or "a business expenditure chargeable against revenue for a specific period." *Black's Law Dictionary* 698 (10th ed.2014). The language in the 1981 amendment does not allow for any additional amount to be added to the expenses relating to the operation of the sewage-treatment plant. RAI is required to pay a percentage of the *expenses* necessary to operate the sewage-treatment plant; the language in the 1981 amendment does not contemplate creating a profit for the owner of the sewage-treatment plant. From all that appears in the language of the 1981 amendment, the sewage-

treatment plant appears to have been intended to operate as a not-for-profit entity.

Furthermore, the 1981 amendment clearly states that, once additional taps were added to the sewer line, RAI was no longer required to pay 90% of the expenses related to the operation of the sewage-treatment plant. The percentage RAI is required to pay depends on the number of other users of the sewage-treatment plant. RAI did not present evidence indicating that, in fact, it had properly determined that it is required to pay only 72% of the expenses associated with the operation of the sewage-treatment plant. Riverbend did not argue that RAI's calculation was in error; instead, Riverbend argued that the 1981 amendment, under which Riverbend had continued to bill RAI 90% of the expenses associated with the operation of the sewage-treatment plant, was not enforceable against it. In light of our reversal of the summary judgment in favor of Riverbend, we note that the question of the appropriate amount owed by RAI, if it is not 72%, remains to be litigated by the parties.

In conclusion, the 1981 amendment created a license in favor of RAI. Per the express language of the 1981 amendment, Riverbend is bound by the license. Because it is bound by the license created by the 1981 amendment, Riverbend is not free during the length of the license to change its billing practices to create a reasonable profit or to change to a per-user, metered billing system. That is, Riverbend is required to apportion "all expenses of the operation of the [sewage-treatment] plant ... on a pro rata basis among the users based on the number of units using the treatment facility system" for the duration of the license. The summary judgment in favor of Riverbend is reversed, and the cause is remanded for the entry of a partial summary judgment in favor of RAI on its claim seeking a judgment declaring that Riverbend is bound by the terms of the 1974 agreement and the 1981 amendment and for further proceedings consistent with this opinion.

APPLICATION GRANTED; OPINION OF APRIL 10, 2015, WITHDRAWN; OPINION SUBSTITUTED; REVERSED AND REMANDED WITH INSTRUCTIONS.

PITTMAN and MOORE, JJ., concur.

DONALDSON, J., concurs specially, with writing, which THOMPSON, P.J., joins.

DONALDSON, Judge, concurring specially.

I concur. I write only to note again that the concept of a motion directed to a nonfinal judgment "quickening" into a motion filed pursuant to Rule 59, Ala. R. Civ. P., upon the entry of a final judgment is not found in the Alabama Rules of Civil Procedure or in the Alabama Rules of Appellate Procedure and could, in certain circumstances, based on the application of Rule 59.1, Ala. R. Civ. P., present a trap for even the most wary practitioner if a second motion is filed raising the same grounds after the judgment is entered. *Ex parte Williams,* 185 So.3d 1106 (Ala. Civ.App.2015) (Donaldson, J., concurring specially).

THOMPSON, P.J., concurs.